**Dr. Nicholas J. CAPOS, Plaintiff-Counterdefendant/Appellant,**

v.

**MID–AMERICA NATIONAL BANK OF CHICAGO, a National Banking Corporation, Defendant-Counterclaimant/Appellee.**

**No. 77–1881.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1978.

Decided Aug. 9, 1978.

---

Wayne B. Giampietro, Chicago, Ill., for plaintiff-counterdefendant/appellant.

Larry M. Wolfson, Chicago, Ill., for defendant-counterclaimant/appellee.

Before FAIRCHILD, Chief Judge, and SWYGERT and PELL, Circuit Judges.

PELL, Circuit Judge.

Dr. Nicholas J. Capos brought this action against the Mid-America National Bank of Chicago (Mid-America) invoking at trial section 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g,[1] and Regulation U promulgated thereunder by the Federal Reserve Board, 12 C.F.R. § 221.1 *et seq.*,[2] and a common law theory that a bank holding stock as collateral for a loan has not only a right but a duty to foreclose on the collateral if its value should fall to the vicinity of the amount owed. After considering an extensive factual and documentary stipulation, deposition and live testimony of Capos and live testimony of a Mid-America official, the district court entered judgment against Capos on his complaint and for Mid-America on its counterclaim for principal and interest due. This appeal followed.

The salient facts are not complicated. In 1966 Capos purchased 5000 shares of stock in diversified Metals Corporation (Diversi-

---

1. 15 U.S.C. § 78g provides, as pertinent:

   (a) For the purpose of preventing the excessive use of credit for the purchase or carrying of securities, the [Federal Reserve Board] shall . . . prescribe rules and regulations with respect to the amount of credit that may be initially extended and subsequently maintained on any security . . . .

   Subsection (d) makes it unlawful to extend or maintain credit "for the purpose of purchasing or carrying any security" in contravention of the rules prescribed by the Board.

2. 12 C.F.R. § 221.1 provides, in pertinent part:

   (a) *Purpose credit secured by stock.*

   (1) . . . no bank shall extend any credit secured directly or indirectly by any stock for the purpose of purchasing or carrying any margin stock in an amount exceeding the maximum loan value of the collateral, as prescribed from time to time for stocks in § 221.4 [20% of the stock's value being the figure prescribed during the period pertinent to this case]

fied),[3] on the advice of his broker. Later that year, on further advice, he purchased 5000 additional shares with funds borrowed from the Michigan Avenue National Bank. The first 5000 shares were used as collateral, and Regulation U was explained to Capos at that time. In 1968, when the bank told Capos it wanted to sell the shares because their value was declining, Capos moved the loan to Mid-America. The April 10 Mid-America loan provided $50,591.83 to pay the loan at the Michigan Avenue National Bank, along with nearly $60,000 to pay income taxes. An earlier $10,000 working capital loan was consolidated therewith, and the entire $120,000 loan was secured by 6000 shares of Diversified, worth at the time about $360,000. No suggestion is made here that this transaction was other than in complete compliance with Regulation U.

In April 1969, Mid-America loaned Capos an additional $25,000 to pay income taxes, the loan being consolidated with the $120,-000 previously owed. The Diversified stock then secured the entire loan, in compliance with Regulation U.

On July 25, 1969, Capos borrowed an additional $22,000 from Mid-America, secured by 4000 additional shares of Diversified stock with a value between $84,000 and $87,000. Capos and Mid-America executed a Form U–1 at the time, as required by 12 C.F.R. § 221.3(a), which stated that the proceeds were to be used for the "purchase of stock (regulated)." If, as the district court found, the purpose of the loan was to purchase margin stock,[4] the loan violated Regulation U because the maximum loan value of the securing stock would have been $17,400. The premise of Capos' Regulation U theory is thus that Mid-America lent him $4600 more than it should have.

While the collateral originally was adequate, the situation changed dramatically in time. The value of Diversified stock fell from $60 per share on April 10, 1968, to approximately $21 per share on July 25, 1969. Unfortunately for all concerned, the slide continued. Although Mid-America at all pertinent times had the right to sell the collateral, it did not do so. Indeed, it was not until May 1972, when the value of the collateral had fallen to approximately $88,-000, or $8.80 per share originally pledged[5] (the outstanding indebtedness being $147,-000 at the time), that Mid-America proposed to sell the stock. Because Capos expressed optimism in Diversified and began a regular principal repayment plan, the stock was not sold. It eventually became worth $3.20 per share originally pledged, if indeed there was a market for the stock even at this price. The district court found, on ample evidence from Capos himself, that Capos had actual knowledge, at least on a week-to-week basis, of the price of the stock during the pertinent period.

### I.

We consider first the district court's judgment on the Regulation U theory. Neither the authorizing statute nor the regulation itself creates a private cause of action to enforce the regulation. In reliance on several decisions,[6] the district court held that a private remedy was properly implicit

---

**3.** The firm later changed its name to Diversified Industries, Inc. For convenience our reference to the firm will be simply as Diversified.

**4.** We reject Mid-America's challenge to this finding. The Form U–1 together with Capos' testimony adequately support the conclusion that such was the articulated purpose. Insofar as the argument is that there is no proof the funds were in fact so used, we agree with the district court that the subsequent use is not the test. We can well imagine the outrage Mid-America would evince if the stated purpose had been to pay income taxes, but the actual use of the proceeds was to purchase margin stock,

and a Regulation U violation was asserted against the bank.

**5.** At some point, Diversified stock split, so the actual value per share may have been somewhat lower in May 1972. The figure per share originally tendered is useful for comparison.

**6.** *Remar v. Clayton Securities Corporation*, 81 F.Supp. 1014, 1017 (D.Mass.1949); *Serzysko v. Chase Manhattan Bank*, 290 F.Supp. 74, 78 (S.D.N.Y.1968), aff'd, 409 F.2d 1360 (2d Cir. 1969), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180; *Smith v. Bear*, 237 F.2d 79, 87–88 (2d Cir. 1956).

in the statute and regulation. Mid-America, indeed, did not argue otherwise. It might well be questioned, after the guidance provided by *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), whether a private cause of action should be implied to enforce Regulation U. *See, e. g., Utah State University of Agriculture and Applied Science v. Bear, Stearns & Co.*, 549 F.2d 164 (10th Cir. 1977), *cert. denied*, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977); and *Theoharous v. Bache & Co., Inc.*, CCH Fed.Sec.L.Rep. ¶ 96,281 at 92,799 (D.Conn., September 7, 1977), both of which hold that Regulation T, which applies margin requirements to *brokers*, does not imply a private remedy. Because the question has not been briefed here, and because, even if there were a private remedy available, this plaintiff could not prevail here, we do not, despite our doubts, need to decide whether a private cause of action is properly implied.

■ The district court held that the remedy was nonetheless barred by the statute of limitations. As there is no limitations period specified for such actions in the Securities Exchange Act of 1934, the limitations period of the forum state, Illinois, which " 'best effectuates' the federal policy at issue" controls. *Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123, 125 (7th Cir. 1972) (citation omitted). The district court found Ill.Rev.Stat.1975, ch. 83 § 15 controlling. It provides that "[a]ctions . . . for a statutory penalty . . . shall be commenced within two years next after the cause of action accrued." The complaint in this action was filed nearly five years after the July 25, 1969, loan. Not surprisingly, Capos invokes the five-year limitations period of Ill.Rev.Stat.1975, ch. 83 § 16:

> actions . . . to recover damages for an injury done to property . . . or to recover the possession of personal property or damages for the detention or conversion thereof, and all civil actions

not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued.

Capos makes no attempt to justify application of the specific provisions of § 16, arguing merely that this is not an action for a statutory penalty, and is thus "not otherwise provided for."

We believe the district court correctly applied § 15. The purpose of the margin requirements, as is plainly indicated in the authorizing legislation, quoted *supra*, is to prevent excessive use of the nation's credit resources for speculation in the stock market. *See Remar v. Clayton Securities Corp., supra*, 81 F.Supp. at 1017. As this court stated in *Daly v. Columbia Broadcasting System, Inc.*, 309 F.2d 83, 86 (7th Cir. 1962):

> Illinois cases demonstrate that if an individual is subjected to civil liability for the violation of a regulatory statute for the general protection of the public, such liability is penal in nature and barred by the two-year statute of limitations. [Citations omitted.]

Furthermore, the relief requested here is a forfeiture of Mid-America's right to recover most of the money lent to Capos [7] and liability of Mid-America for the diminished value of the Diversified securities. We note that this diminution in value bears absolutely no relationship to the Regulation U violation, and that absent the diminution the only "injury" to Capos was that Mid-America lent him $4600 more than it should have. This activates the Illinois rule that a statute "imposing a forfeiture or penalty for transgressing its provisions . . . when the object of the statute is clearly to inflict punishment on the party violating it" is penal. *Superior Laundry & Linen Supply Co. v. Edmanson-Bock Caterers, Inc.*, 11 Ill.App.2d 132, 136 N.E.2d 610 (1956). *See also Schiffman Bros. Inc. v. Texas Co.*, 196 F.2d 695 (7th Cir. 1952), holding that § 15 governs, in Illinois, actions brought under

---

7. There is no request that the funds lent to pay income taxes or for working capital be forfeited, although the calculation of "damages" sought would apparently apply all principal payments made by Capos to these loans.

the treble damage provisions of the Clayton Act, 15 U.S.C. § 15.[8]

Capos argues that even if a penalty is involved, it is not a *statutory* penalty within the meaning of § 15 because it is not explicitly provided for by statute. The argument is specious. Literal precision in borrowing an appropriate statute of limitations from the forum state is not required, and even if it were, the very premise of this lawsuit is that the federal statute directly implies this cause of action and these remedies.

## II.

■ With regard to the common law theory, the district court thought that there was a duty on Mid-America to exercise reasonable care in preserving the value of the Diversified stock collateral, but concluded that the bank had not breached its duty, and that Capos' contributory negligence barred recovery in any event. We would have no difficulty affirming the court's judgment on the ground of contributory negligence if the underlying duty were that found by the district court to exist. Clearly Capos had equal opportunity with Mid-America to stay apprised of the declining value of the stock, and the district court's finding that Capos in fact did so, at least weekly, is fully supported by the evidence. At any point prior to the stock's value becoming less than the amount owed, Capos could have instructed the bank to sell the stock and liquidate the debt. Thereafter, he could have acquiesced in Mid-America's suggestion that the stock be sold. The loss in the stock's value was, quite simply, an investment loss, the investment was Capos', not Mid-America's, and any negligence in not cutting the losses was *at least* equally his.

■ Mid-America urges us to affirm the district court judgment on the alternative ground that a bank has no duty to its borrower to sell collateral stock of declining value. We think it appropriate to do so. It is the borrower who makes the investment

decision to purchase stock. A lender in these situations merely accepts the stock as collateral, and does not thereby itself invest in the issuing firm. Nor, unless otherwise agreed, does the lender undertake to act as an investment adviser, although imposing a duty on the lender to sell the stock at the "reasonable" time would foist that role upon it. Not surprisingly, Illinois common law did not impose a duty on a pledgee to sell shares of stock at any time or liability for depreciation of the shares' value while in his possession. *Rozet v. McClellan*, 48 Ill. 345, 348 (1868).

The Uniform Commercial Code, which now governs these situations provides:

> A secured party must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed.

Ill.Rev.Stat.1975, ch. 26 § 9–207(1). The Illinois Comments on this provision make it clear that the first sentence adopts the standard of care of the Restatement of Security, § 17 (1941), and that the second sentence adopts the standard of Restatement § 18. Restatement § 17 is in language quite similar to that used in § 9–207(1), but Official Comment a. is dispositive evidence that the duty imposed is not that urged by Capos:

> The rule of reasonable care expressed in this Section is *confined to the physical care of the chattel*, whether an object such as a horse or piece of jewelry, or a negotiable instrument or document of title. (Emphasis added.)

The language of Restatement § 18 is much like that of the second sentence of § 9–207(1), and neither would appear to have any pertinence to the mere diminution in market value of securities. If there can be any doubt, Official Comment a. to the Restatement provision ends it: "The pledgee

---

8. *Chattanooga Foundry and Pipe Works v. City of Atlanta*, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906), cited by Capos, is inapposite, for its

purported to do no more than decide the proper result under Tennessee law.

is not liable for a decline in the value of pledged instruments, even if timely action could have prevented such decline."

We see no warrant in Illinois law for engrafting a new and significantly burdensome duty onto § 9–207(1). Although the district court's opinion referred to "harsh" results not in keeping with present day commercial realities if the statute's language is given its natural and apparently intended meaning, we see nothing harsh or unrealistic about requiring a borrower/investor to contract for investment advice if he wishes to receive it. As for the authorities relied upon by Capos and the district court,[9] they are readily distinguishable, as they involved failures to exercise rights to convert debentures into stock and a failure to present a note for payment (thus releasing a solvent indorser). Either situation falls within the second sentence of § 9–207(1), see Illinois Code Comment 2, whereas this case, as we have said, does not.

For the reasons set out herein, the judgment of the district court is affirmed.

**9.** *Reed v. Central National Bank of Alva*, 421 F.2d 113 (10th Cir. 1970) (conversion rights); *Grace v. Sterling, Grace & Co.*, 30 App.Div.2d 61, 289 N.Y.S.2d 632 (1968) (conversion rights); *State Bank of Clinton v. Parkhurst*, 155 Ill.App. 101 (1910) (presenting note for payment).