In the

# United States Court of Appeals
## For the Seventh Circuit

No. 10-1184

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MANU SHAH and SHAH ENGINEERING, INC.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Central District of Illinois, Division.
No. 3:07-cr-30003-JES-BGC—**Jeanne E. Scott**, *Judge.*

ARGUED NOVEMBER 1, 2010—DECIDED DECEMBER 16, 2011

Before ROVNER, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Manu Shah pled guilty to two counts of mail fraud and one count of submitting false documents; Shah Engineering pled guilty to one count of mail fraud. *See* 18 U.S.C. §§ 1001, 1341. Their sentences included an order of restitution of $10 million for which they are jointly and severally liable. They appeal from the district court's January 15, 2010, order

that denied them the credit they claim is due toward restitution. They seek "full, dollar-for-dollar credit for the value of the monies and securities that Mr. Shah deposited with the Clerk of Court at the time of their deposit," which deposits were made pre-judgment. For the reasons following, we dismiss Shah's appeal and affirm the district court's judgment against Shah Engineering.

## I. Background

Manu Shah was the sole shareholder, owner, and operator of Shah Engineering, Inc., a Chicago-based corporation. Shah Engineering worked for many years as a contractor and subcontractor for numerous Illinois governmental entities, including the Illinois Department of Transportation ("IDOT"), the Illinois State Tollway Authority, and the City of Chicago. In connection with these contracts, Shah and Shah Engineering prepared and submitted invoices for the work performed. The invoices were supposed to be supported by documentation of the hours worked, costs, and expenses associated with the contracts, which documentation was to be maintained by Shah Engineering.

In 2003, IDOT decided to audit Shah and Shah Engineering. During its review of Shah Engineering's records, IDOT uncovered numerous irregularities and falsified documents, and it alerted the United States Attorney's office. On January 22, 2007, Shah and Shah Engineering were charged with mail fraud in violation of 18 U.S.C. § 1341 and Shah was charged with submitting false documents in violation of 18 U.S.C. § 1001.

On February 1, 2007, Shah waived indictment and pled guilty to all charges against him pursuant to a binding plea agreement, which contained a waiver of Shah's right to appeal. Later that month, Shah Engineering likewise waived indictment and pled guilty to one count of mail fraud. Shah's plea agreement acknowledged that the court may order restitution. The agreement set forth certain obligations that Shah agreed to undertake including:

> The defendant will deposit the sum of $2,500,000 with the Clerk, U.S. District Court, by certified check, money order, or stock certificates (if acceptable with the Court) within 15 (fifteen) days of the filing of this agreement. The defendant will deposit an additional $1,000,000.00 to this fund each 30 (thirty) days after the initial deposit for a period of 90 days, until a total of $5,500,000 in principal is on deposit. . . . The defendant agrees to the entry of any order necessary for the Clerk to invest the funds in an interest-bearing account.

> *The clerk will hold this deposit in escrow* . . . . The funds *in escrow* shall be used for the payment of any order of the Court for restitution to the victims of these offenses and the remainder will be used to pay the fine to be imposed on Shah Engineering, Inc. Once the fine, restitution and special assessments ordered are fully satisfied, the remainder, if any, less the 10% accumulated interest, should be returned to the defendant. Should the restitution order exceed the amount on deposit, the defendant will be obligated to pay the balance within 30 days.

Shah Plea Agreement ¶ 14 (emphases added). In consideration of these deposits, the United States Attorney agreed that it would not institute any "forfeiture actions to forfeit property as the proceeds of the unlawful activity outlined in the information." *Id.* ¶ 16. The parties further agreed that Shah "demonstrated . . . acceptance of personal responsibility for [his] criminal conduct in accordance with Section 3E1.1 of the Sentencing Guidelines," a "two-level reduction in the offense level is appropriate," and Shah qualified for an additional one-point reduction under § 3E1.1(b)(2), if such reduction was available. *Id.* ¶ 18(b). The plea agreement was signed by Shah's two trial attorneys, the Assistant United States Attorney ("AUSA"), and Shah himself.

Shah Engineering entered into a plea agreement that stated "an appropriate sentence for this offense will be a term of probation and a fine up to the amount of $500,000.00, and an order for restitution to the victim(s) of this offense in an amount determined by the Court" and "[t]he fine shall be satisfied by the funds submitted to the Clerk of the Court pursuant to paragraph 14 of the plea agreement executed by Manu Shah." Shah Eng'g Plea Agreement ¶ 11. Its plea agreement, like Shah's, contained a waiver of appeal rights. The plea agreement was signed by Shah on behalf of Shah Engineering, defense counsel, and the AUSA. Both plea agreements were filed with the district court on January 22, 2007.

At Shah's plea hearing, the magistrate judge reviewed with Shah in detail the plea agreement, including paragraph 14 regarding the deposits to be made. (The parties

consented to proceeding before the magistrate judge.) The judge questioned whether the Clerk could accept stock certificates, and the AUSA said that "the intent here is to make sure that there is *a pool for restitution* when that figure is decided by the Court . . . and anything that goes towards that intent is acceptable to the government." (emphasis added). The judge and deputy clerk clarified that the Clerk's "office said that holding stock certificates is satisfactory[.]" At that point, the judge expressed concern about how the stock certificates would be valued. Shah stated that he understood his obligation under paragraph 14 and thought he could fulfill it. The judge then recited the express language stating that "[t]he clerk will hold this deposit in escrow" and "[t]he funds in escrow shall be used for the payment of any order of the Court for restitution to the victims of these offenses and the remainder will be used to pay the fine imposed on Shah Engineering." The AUSA added that the agreement contemplated that any monies remaining after payment of restitution and the fine "would be returned to Mr. Shah." The judge confirmed that was Shah's understanding as well. He also confirmed Shah's understanding that " '[s]hould the restitution order exceed the amount on deposit, the defendant will be obligated to pay the balance within 30 days.' So if this money that is up is short, then you have 30 days to pay the difference, understood?" Shah answered, "Yes."

At the end of the hearing, the magistrate judge asked defense counsel if he had reviewed the government's proposed order concerning paragraph 14 of the plea agreement. Shah's counsel stated that he had read it

and had "no objection." The judge said that the order would be entered that day. As promised, later that day the court issued an order regarding the deposits Shah agreed to make with the Clerk. The order stated that it was "[p]ursuant to the Plea Agreement filed on January 22, 2007, and local Rule 67.2," and instructed Shah to deposit $2.5 million by February 7, 2007, and to make three deposits of $1 million each by March 7, 2007, April 9, 2007, and May 7, 2007. The order said that "if the deposits made by the defendant are cash or cash equivalents, the Clerk of the Court is directed to invest such in an interest-bearing account with the Registry Account by the defendant and retain said funds until further order of the Court." With respect to deposits of stock certificates, the order provided that "the Clerk of the Court shall hold such until further order of the Court." And on February 27, 2007, at Shah Engineering's plea hearing, the magistrate judge thoroughly reviewed the plea agreement, including the provisions regarding restitution with the corporate representative, who stated that he understood the terms of the agreement.

The magistrate judge determined that the guilty pleas of Shah and Shah Engineering were knowing and voluntary and that the crimes charged were supported by an independent factual basis as to each element of the offenses. He recommended that the guilty pleas be accepted and the defendants be adjudged guilty. No objections were filed to these recommendations and the district judge accepted them. Sentencing was set for June 4, 2007.

Shah did not adhere to the deadlines for making deposits. However, the Clerk received, on Shah's behalf, about $2.5 million in stock certificates on March 23, 2007, about $2 million in stock certificates on May 17, 2007, about 250,000 shares in stock certificates worth about $1 million on August 24, 2007, and 21,666 shares in stock certificates on February 27, 2008, with a total fair market value of about $5.5 million at the time of deposit. (Apparently the last deposit did not add any value to the total.) The parties do not dispute that these were the stocks' worth in the market as of the dates of deposit.

The judge repeatedly continued sentencing to allow for the completion of the audit of Shah Engineering's contracts, calculation of the loss and restitution amounts, and sufficient preparation and narrowing of the issues by the parties. Meanwhile, the stocks Shah deposited with the Clerk during a historic bull market, *see* Oliver Silverstein, *Historic, Multi-Year Bull Market in U.S. Stocks Likely Over*, InsideInformationDaily.info (Nov. 18, 2007), http://insideinformationdaily.info/Historic-Multi-Year-Bull-Market-in-U.S.-Stocks-Likely-Over.htm ("I believe this is the END of the bull market in stocks that we've grown up with. I believe you've just seen an historic top."), depreciated significantly. Shah contends that their value had fallen to below $2 million about one year after deposit. Not all the stocks went down in value though; a few actually appreciated. In July 2007, Shah's stockbroker, Michael Brcic, contacted a Clerk's office employee by email and advised that some of the deposited stocks were nearing a "target price" (i.e., the price at which Brcic had agreed with Shah to sell them) and requested that they be

"swapped" for other stock of equal or higher value. The Clerk's employee responded that "it is not the Court's intention that the stock be 'swapped' out at anytime [sic], whether or not it gets to the target price." The record contains no indication that Shah or his counsel contacted the government, the district judge, or the magistrate judge to make a request to sell any of the stocks on deposit.

On April 29, 2008, the district judge held a hearing attended by Shah, Shah Engineering, and counsel. The AUSA stated that the parties' sentencing memoranda revealed they were far apart on the amount of the loss and restitution, but they had been trying to reach an agreement. The government was seeking "an exceptional showing of acceptance of responsibility," which would allow "Shah to earn back that acceptance of responsibility that is now no longer in the Pre-Sentence Report." (Just three months before, the government had expressed concerns over whether Shah was living up to his obligations under the plea agreement, claimed that "documentation supplied by Shah cannot be trusted," and asserted that he was obstructing justice in the course of negotiating the loss and restitution amount.) To that end, the parties agreed that before sentencing, Shah would post the total amount of an agreed upon loss/restitution figure of $10 million. The government asked for a six-month continuance of the sentencing hearing to allow Shah to accomplish this. The AUSA stated that Shah committed to a payment plan regarding the amounts "to be posted." The AUSA continued:

> But at the end, by the time the sentencing comes up, the full ten million dollars *in cash; not in stock or any other negotiable instruments*; but the ten million dollars will be posted with the Court and subject to be paid out as restitution at the time.

> That is our goal . . . to make sure that the victims are made whole, or as close as possible, at the time of sentencing.

(emphasis added). The court invited a response by defense counsel, and Shah's attorney confirmed that the parties had agreed to a restitution amount of $10 million.

Counsel stated, however, that a lot of Shah's money was illiquid and "we need to work with other people to make sure that this money is properly loaned to Mr. Shah in order to make restitution." He explained:

> Mr. Shah posted five and a half million dollars of stock at the beginning of this case . . . [which] is now worth I think 4.1 million dollars.

> What we are going to do . . . is to move around some of the stock, sell some, cash it in, and then every month *make a payment to the escrow* in the amount of a half million dollars.

> At the end of the six months we should have approximately 8 million dollars or 8.5 million dollars *in that escrow*. There would then be a balloon payment which would be made on November 15th which would be the balance of the 10 million dollars.

(emphases added). Shah's counsel stated that some of the defrauded agencies actually owed Shah money for work performed, to the tune of $1.5 million. He intended to work with the government to try to use that money toward the $10 million. The court then confirmed defense counsel's understanding that the parties agreed the amount of loss and amount of restitution would be $10 million. At that point, the court advised:

> In the event you, counsel, and his financial advisors, think it advisable to sell the stock that was deposited, if you are all agreeable to do that and put forth a plan on how to do it, and substitute the cash, I would entertain this during this six months hiatus; rather than just have it diminish in value, if you think that's the way it's going.
>
> I leave that to you to request that. But if it's a joint request and a means for doing it is put forth that sounds sensible, I would entertain that.

The court asked Shah if he had heard what had been represented in court and whether that was agreeable to him; Shah answered, "Yes."

On June 16, 2008, the district court entered an order memorializing Shah's agreement "to pay amounts of at least $500,000 per month toward a possible order of restitution from May, 2008 through November 23, 2008, to equal a total of $10,000,000." The court ordered that "[t]he money deposited shall be held by the Clerk in the Court's Registry Fund." In July, August, and September 2008, Shah deposited payments of $500,000 each for an additional $1.5 million. He made no more payments, however.

On November 16, 2008, the defendants filed Defendants'
Supplemental Commentary on Sentencing Factors, noting
that the court's June 16 order memorialized Shah's agree-
ment to pay $500,000 per month from May to November
2008, "toward a possible order of restitution." They
acknowledged that Shah "agreed to post $5,500,000 of stock
with the U.S. District Court Clerk's Office *in escrow* to
pay restitution" and referred to "the stock *being held
in escrow*." (emphases added). They also noted that
the AUSA's email of April 24, 2008, indicated "that
the dollar value of *Shah's stocks being held in escrow* was
now $4,184,430.00" and that during the April 29
hearing, "the Court advised the government that
Shah should be able to swap out *stocks held in escrow* so
that he was not force[d] to incur stock losses." (emphases
added). The defendants said that the stock market contin-
ued to suffer and that "the value of the stock posted
by Shah is now worth approximately $1,989,303."
They asserted that "Shah initially posted an amount
sufficient to cover all purported civil and criminal
loss sustained by the governmental entities." Since that
time, however, the amount of the loss increased and
Shah's assets decreased. The defendants requested "a
restitution order which would provide Shah with addi-
tional time to pay the agreed upon restitution" and sug-
gested "that certain target prices can be agreed upon
for *stocks held in escrow* so that these stocks can be con-
verted to cash in a better market," and that "[t]he stocks
being posted *can be held in escrow* with an instruction
that the stock be transferred to the government at the
end of the restitution period if the stock has not
already been sold or replaced by cash." (emphases added).

On June 23, 2009, the government filed an Updated Commentary on Sentencing Factors, noting that "[a]s of June 19, 2009, *the amount in escrow* was $1.5 million posted as cash, and securities valued at $2,442,661.00, for a total of $3,942,661.00." (emphasis added). It also noted that the parties stipulated to a loss amount of $10 million; however, the victims had requested restitution totaling $13,258,101.13.

On June 25, 2009, days before sentencing, the defendants filed an addendum to Defendants' Supplemental Commentary on Sentencing Factors, which stated:

> Shah took steps early on to ensure that restitution would be paid *by depositing stock and cash into an escrow. . . .*
>
> Mr. Shah agreed to pay $10,000,000.00 in restitution . . . . Prior to agreeing to the restitution, Mr. Shah had deposited the market value of $5.5 million in stock after entering into the Plea Agreement. . . . [T]he value of the escrow account has drastically declined . . . .
>
> Mr. Shah expected to make the required restitution payments before the sentencing hearing scheduled for June 30, 2009. . . . Mr. Shah intends to make the full restitution payment but will need a reasonable amount of time in order for the posted equities to appreciate in value. Mr. Shah's financial consultant believes that the equities currently being held in escrow will appreciate in value over the next few years. . . . As the market value of the equities increase, the equities can be sold and the cash distributed to the agencies.

(emphasis added). Invoking fairness, the defendants asserted that "Shah should be credited with the value of the stock and cash he deposited ($7.0 million) or be given time to allow these stocks to appreciate in value." They proposed terms for a restitution agreement, including that "Shah posted $5.5 million in stock in three install-ments in 2007," "Shah made cash payments in the amount of $1.5 million in 2008," and "[t]he *current escrow balance in the possession of the Government is $2.44 million*" (emphasis added). The defendants also proposed terms for the restitution order, including that "[t]he Clerk's Office shall take possession of all securities and cash currently being held in the escrow account," "[t]he cash currently being held in the escrow shall be immedi-ately distributed to the agencies," and "Shah shall begin liquidating equities currently being held in escrow."

A sentencing hearing for the defendants was held June 30, 2009. The government recommended that Shah get a three-point reduction for acceptance of responsibility. In connection with that recommendation, Shah's counsel asserted:

> . . . [W]e figured what's the worst case scenario and we came up with five and a half million and that's what Mr. *Shah put up in the escrow*. And unfortu-nately, Monday morning quarterback, he should have put it up in cash. He didn't. In his mind the stock's been doing well, he put up stocks in escrow and they plummeted.
>
> I don't think Mr. Shah should be faulted for that. I mean he still put a good faith amount of money

up. And that again . . . goes to acceptance of re-
sponsibility.

(emphasis added). Counsel continued, "because of
the market, because of his assets, because of the
equities and the escrow, he could not live up to the 500,000
dollars a month that he was supposed to pay."
Counsel noted that at one time, Shah's financial
advisor had wanted to liquidate some of the stocks,
the Clerk's office wouldn't allow it, but the court said
that they should be able to sell the stock. Counsel con-
ceded, however, that "[u]nfortunately, the market
kept going down." He also noted that Shah's equities
were "in escrow with the Court" and asked for a restitution
order that would allow Shah five years to pay.
Counsel suggested that the financial advisor work with
the government "to set target prices for certain stocks . . .
and that those stocks be liquidated and the money
be immediately *transferred to the Court* for restitution
allocation." (emphasis added).

The district court sentenced Shah to 41 months of
imprisonment and sentenced Shah Engineering to
two years probation and ordered it to pay a $500,000 fine.
The court ordered the defendants, jointly and severally,
to pay restitution in a total amount of $10 million. The
court said that "[t]he amounts that have been held in
an escrow account with the Court are to be sold within
the next 30 days. I'm sorry if amounts go up and
amounts come down, but I'm not going to risk any
more going down, which is as likely as going up."
The court ordered that $1 million be paid toward restitu-

tion within 60 days and the balance paid in 18 months. Defense counsel asked whether the financial advisor could trade a stock in escrow for other stock, and the court said not unless the government stipulated that it would agree to that.

Judgments were entered July 7, 2009, and included restitution orders in the amount of $10 million. Shah's judgment provided that a "$300.00 special assessment is due within 30 days of judgment date" and directed the Clerk "to apply $1,500,00 [sic] in cash paid by the defendant to the victims of the instant offense. *Stocks in escrow* to be sold within 30 days." (emphasis added). It also ordered Shah "to sign any documents necessary to complete sales" and "to pay $1,000,000.00 of restitution within 60 days and the balance within 18 months of judgment date." Shah Engineering's judgment contained similar language and ordered payment of a $400 special assessment and $500,000 fine. The judgments held the defendants jointly and severally liable for the total restitution ordered.

Neither defendant challenged the judgments by filing a notice of appeal within the time allotted by Fed. R. App. P. 4(b)(1)(A)(i) (then ten days), or filed a motion pursuant to Fed. R. Crim. P. 35(a) to "correct a sentence that resulted from arithmetical, technical or other clear error." The Clerk did not sell the stocks within 30 days of the judgment. By this point, though, the value of the stock was on the rise and neither Shah nor the government brought the Clerk's inaction to the district court's attention.

On August 12, 2009, the government moved for a turn-over order directing the Clerk to transfer the $1.5 million Shah deposited into the Court Registry Fund to the restitution balance. Later that same day, the government moved to withdraw the motion because the Clerk already had administratively transferred (on August 5, 2009) the funds to the restitution account.

The U.S. Department of Justice sent Shah a Notice of Intent to Offset, dated October 1, 2009, indicating a balance due on his criminal judgment debt of $8,499,600. This reflected the $1.5 million transfer and an additional $400 payment. The Notice said that any and all payments due to Shah from the federal government, including federal income tax refunds and federal benefits payments, would be offset to pay the amount of the debt.

Later, on December 11, 2009, the defendants' new attorney entered an appearance and filed a motion seeking an order that defendants "be given full, dollar-for-dollar, credit for the entire $7 million restitution paid during 2007 and 2008 at the values as they were at the time of their respective payments." The motion requested the district court stay the seizure of any other property to satisfy the restitution "because the government now maintains that approximately $5.5 million more is owed than is actually owed." The defendants argued that Shah surrendered control over the securities when he delivered them to the Clerk and the securities were payments of restitution. They also argued that the Clerk, the court, or the government made the decision to hold the securities that were deposited and should have con-

verted them to cash when Shah deposited them. And the defendants asserted that the diminution of the value of the securities was not caused by their criminal conduct and the payments were intended as restitution payments. The government responded that the stock was deposited into escrow as security and the defendants should get credit toward restitution for the value of any security at the time of its sale. It also argued that the "defendants understood and acknowledged all along that the securities were in escrow" and they bore the potential risks (and gains).

On January 15, 2010, the district court denied the defendants' motion. The court rejected the claim that Shah made a restitution payment in 2007, finding that such a claim did "not comport with the facts." It determined that the stock was deposited into escrow as security for the defendants' restitution obligation, a conclusion it found supported by the terms of the Plea Agreement and Shah's representations through counsel at the April 29, 2008, hearing. Citing *Capos v. Mid-America National Bank of Chicago*, 581 F.2d 676 (7th Cir. 1978), the court determined that the net proceeds from the sale of the securities, not the value of the securities at the time they were posted, should be applied to the restitution obligation. It concluded that the two Ninth Circuit cases cited by defendants, *United States v. Smith*, 944 F.2d 618 (9th Cir. 1991), and *United States v. Tyler*, 767 F.2d 1350 (9th Cir. 1985), were inapplicable because Shah "deposited the stock as security and retained a right to recover the stock upon payment of the restitution." Noting the government's representation that Shah was not in compli-

ance with the payment schedule in the judgment (he did not make his first $1 million restitution payment within 60 days), the court declined to stay the government's collection efforts. The court also noted that at that time "the stock deposited by Shah remains in the Clerk's possession."

On January 20, 2010, the Clerk of Court withdrew the shares of stock that Shah had deposited and asked Merrill Lynch to sell them. The Clerk indicated that the funds would be applied to Shah's restitution order.

On January 22, 2010, the defendants filed a notice of appeal indicating that they were seeking relief "from the Opinion entered in this matter by [the district court] on January 15, 2010[.]" Following oral argument in this court, the government moved the district court to supplement the record on appeal with a copy of the report of restitution receipts and disbursements maintained by the district court's financial administrator. The district court granted the motion and supplemented the record with the U.S. Courts Case Inquiry Report, dated November 4, 2010. The report reflects the sale of the stock and the credit to the defendants, indicating that $5,311,425.83 has been collected toward restitution and that on March 17, 2010, Shah was credited with $3,776,000.44, presumably from the sale of the stock. According to the report, Shah's total outstanding debt is $4,688,974.17 (including the special assessment and restitution) and Shah Engineering's total outstanding debt is $5,188,974.17 (including the fine and special assessment).

## II. Discussion

The defendants maintain that "Shah's payment of $5.5 million in stock certificates was a payment of restitution" and they should be given "full credit for the $5.5 million in securities that [Shah] paid in restitution." Because restitution in criminal cases can only be ordered for losses attributable to the charged offense(s), *see, e.g.*, *Hughey v. United States*, 495 U.S. 411, 413 (1990), they argue that the diminution in the value of the securities after Shah deposited the stock certificates cannot be attributable to them. The government responds that the defendants' appeal waivers bar this appeal, and the defendants reply that the government failed to timely assert waiver, thus waiving this waiver argument. Because the defendants cite no authority for their waiver argument, it is deemed waived. *See United States v. Thornton*, 642 F.3d 599, 606 (7th Cir. 2011). But the defendants have another argument—that the appeal waivers do not reach the issues on appeal.

Our first task is to confirm that we have jurisdiction to hear this appeal. *E.g., United States v. Harvey*, 516 F.3d 553, 556 (7th Cir. 2008). An appeal may be available when a district court imposes a restitution obligation, at certain concrete stages of enforcement, *see, e.g., United States v. Sloan*, 505 F.3d 685, 687 (7th Cir. 2007) (garnishment order); *United States v. Kollintzas*, 501 F.3d 796, 800-02 (7th Cir. 2007) (same), or when a defendant has a fair argument that he has satisfied his restitution obligation, *see, e.g., United States v. Lilly*, 206 F.3d 756, 763 n.4 (7th Cir. 2000) (defendant sought a determination in accordance with the court's authority over conditions of his supervised

release that restitution obligation had been satisfied). But this case was not at any of these points when the defendants appealed from the January 15, 2010, order. What the defendants really are asserting is that the restitution orders, entered back in July 2009, should have been $4.5 million—not $10 million. Clearly, they are not contending that they should get credit for the value of the securities on the date of sentencing—the value then was even less than the value on the date of sale. And by arguing that the credit eventually given toward restitution is not enough, they are not disputing what the Clerk obtained from the sale of the securities, but rather are disputing that restitution was computed correctly at the time their sentences were imposed.

So is their appeal timely? When the district court entered judgment in July 2009, the Federal Rules of Appellate Procedure stated: "In a criminal case, a defendant's notice of appeal must be filed in the district court within [10] days after . . . the entry of . . . the judgment. . . ." Fed. R. App. P. 4(b)(1)(A)(i). If this appeal is actually an appeal of the restitution orders, the defendants failed to timely appeal from the district court's judgment that ordered restitution. But Rule 4(b)'s time limit is "not jurisdictional and is merely a claim-processing rule that can be forfeited." *United States v. Neff*, 598 F.3d 320, 323 (7th Cir. 2010). We enforce this time limit "when the appellee stands on its rights[.]" *United States v. Rollins*, 607 F.3d 500, 501 (7th Cir. 2010) (government argued court lacked jurisdiction over appeal which was filed more than ten days after the district court's order). Here, the government did not assert the untimeliness of the challenge to the

restitution amount or the appeal until filing its supplemental brief in this court. Perhaps the government did not contest the timeliness because the district court's view on whether the defendants would be credited with $5.5 million toward restitution was unknown until it issued its January 15, 2010, decision.

And that brings us to another question: Do the defendants' appellate waivers waive the issues raised in this appeal? "We may not address the merits of [a defendant's] argument . . . if we conclude that he waived the right to appeal the restitution order." *United States v. Worden*, 646 F.3d 499, 502 (7th Cir. 2011). Waivers in plea agreements are generally valid if they are knowingly and voluntarily made, though we enforce a waiver only if the disputed appeal comes within the ambit of the waiver. *See United States v. Quintero*, 618 F.3d 746, 750 (7th Cir. 2010). We interpret the terms of the plea agreement according to the parties' reasonable expectations and construe any ambiguities in the light most favorable to the defendant. *Id.* at 751. We also consider the plea colloquy to determine if the district court properly informed the defendant that the waiver may bar the right to appeal. *Id.*

Shah's plea agreement contained a broad waiver of the right to appeal:

> The defendant is aware that federal law . . . affords a defendant a right to appeal a final decision of the district court and that federal law . . . affords a defendant a right to appeal the . . . sentence imposed. Understanding those rights, and

having thoroughly discussed those rights with the defendant's attorney, the defendant knowingly and voluntarily waives the right to appeal any and all issues relating to this plea agreement and the conviction and to the sentence, *including any fine or restitution,* within the maximum provided in the statutes of conviction, and the manner in which the sentence, including any fine or restitution, was determined, on any ground whatever, in exchange for the concessions made by the United States in this plea agreement, unless otherwise stated in this paragraph. The defendant retains the right to appeal his sentence if there is the imposition of a prison sentence above 41 months.

Shah Plea Agreement ¶ 10 (emphasis added). Likewise, Shah Engineering's plea agreement contained a waiver, though not as broad as Shah's:

The Corporation is aware that Title 18, United States Code, Section 3742 affords a defendant a right to appeal the sentence imposed. The Corporation knowingly waives the right to appeal any sentence within the maximum provided in the statutes of conviction, or the manner in which that sentence was determined, on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever, in exchange for the concessions made by the government in this Plea Agreement so long as the monetary fine imposed upon the Corporation by the Court, not including restitution, does not exceed $500,000.00.

Shah Eng'g Plea Agreement ¶ 12.

Our review of the transcripts of the plea colloquy for both Shah and Shah Engineering confirms, as the magistrate judge found and the district court accepted, that the defendants knowingly and voluntarily waived their rights to appeal. As for Shah, the court addressed the appeal waiver: "It is a blanket waiver unless you're sentenced to a period of imprisonment above 41 months. So if it is 41 months and one day, all of your appeal rights are reinstated." The AUSA clarified that the appeal rights reinstated would be just to the length of the sentence and that any challenge to the proceedings was "waived in all circumstances." Shah's counsel agreed, and Shah himself said that he understood. He also said that he understood that if a sentence of 41 months and one day or more was imposed, he had the ability to appeal the sentence, "but not anything other than that." The court also discussed the appeal waiver with Shah Engineering, noted that paragraph 12 was the waiver of the right to appeal, and said, "What the corporation's [sic] doing here is waiving any and all rights to any and all appeals unless the monetary fine exceeds $500,000[.]" Shah Engineering's representative agreed with the court's interpretation.

The district court did not sentence Shah to a term of imprisonment greater than 41 months and did not impose a fine in excess of $500,000 on Shah Engineering, so the exceptions to the appeal waivers do not apply, and we consider whether the issues in this appeal fall within the scope of the waivers. Shah waived "the right to appeal any and all issues relating to this plea agreement and the conviction and to the sentence, *including any fine or restitu-*

*tion . . .* and the manner in which the sentence, including any fine or restitution, was determined, on any ground whatever[.]" Without hesitation, we conclude that Shah waived his right to appeal his restitution order. So, if he is attempting to do so now, then his appeal should be dismissed.

As we have noted, however, Shah Engineering's waiver is not as broad as Shah's. It waived only "the right to appeal any sentence within the maximum provided in the statutes of conviction . . . on any ground whatsoever." The statute of conviction, 18 U.S.C. § 1341, does not provide for restitution, and Shah Engineering did not specifically waive the right to appeal restitution. That puts Shah Engineering in a position like that of the defendant in *United States v. Behrman*, 235 F.3d 1049, 1052 (7th Cir. 2000), where we held that a waiver of the right to challenge "any sentence within the maximum provided in the statute(s) of conviction" did not extend to the right to appeal restitution. But during the plea colloquy, the magistrate judge interpreted the appeal waiver language as waiving "all rights to any and all appeals unless the monetary fine exceeds $500,000," and the corporation's representative agreed. This gives us pause. The magistrate judge's oral interpretation was incomplete and, by omitting key, restrictive language ("provided in the statutes of conviction"), attributed more breadth to the scope of the waiver than the language will bear. We do not treat Shah Engineering's oral agreement with this interpretation as enlarging the scope of the written waiver which provides otherwise, particularly given the government's concession at

oral argument that its waiver argument is fairly weak as to Shah Engineering. Thus, we do not conclude that Shah Engineering's appeal waiver bars its right to appeal the restitution order.

We note that Shah Engineering is defunct and unlikely to pay anything toward the restitution order, and the defendants are jointly and severally liable for the restitution ordered. So, even if the only appeal we consider is Shah Engineering's, we recognize that the practical effect of our decision also falls on Shah. And an equally pragmatic consideration is that Shah and Shah Engineering presented joint arguments on all points without any differentiation between them. Therefore, although Shah Engineering's appeal is the only matter properly before us as a jurisdictional matter, we will discuss the arguments presented as though they are made by both defendants.

Turning to the merits, the defendants argue that Shah gave up all control over the stocks when he deposited them with the Clerk, and, consequently, the decline in value was on the Clerk's watch. In their view, the district court's January 15, 2010, order rested on the erroneous assumption that Shah had control over the stocks. In a related argument, they assert that the "Risk Of Loss Passes to the Holder Of The Funds And The Victims Once The Wrongdoer Relinquishes The Stolen Assets, And Restitution Must Be Premised Exclusively On Losses Caused By The Charged Criminal Conduct." The government responds that the district court correctly found that the stock certificates were in escrow

as security for restitution and Shah bore the risk of a decrease in their value. The government asserts that Shah had control over the stocks and could have sold or exchanged them for other stocks, under an appropriate plan, but didn't because "the market kept going down." It also asserts that Shah deposited the stocks when they were "doing well" and wanted to profit from their expected appreciation.

The defendants point to various portions of Shah's plea agreement and other parts of the record to support their claim that Shah gave up control of the stocks when he deposited them. For example, they state that "[t]he plea agreement contains no provision that once the payments were made that Shah would have any authority or duty to manage them." True, but the defendants conveniently overlook a key purpose of the stock deposit, as stated in the plea agreement and at the plea hearing: to appease the government so it would not initiate forfeiture proceedings against Shah. One way to appease the government was by creating a pool for future restitution. And Shah exercised control in choosing how to contribute to that pool—he could have sold the stocks at the outset and deposited cash instead.

The defendants also claim that Shah's attempts to sell the securities were thwarted, citing the July 2007 email exchange between his broker and the Clerk's office. They make more of this exchange than the record will bear, however. Shah never made a motion with the district court—the judge—seeking to swap out stocks. And Brcic didn't ask for permission to sell stock and deposit

the proceeds with the Clerk; he simply wanted to change the stocks in the account. Tellingly, at the April 29, 2008, hearing, the district judge clearly stated that if Shah wanted to sell the stocks on deposit, substitute the cash, and avoid future diminishing value, all he had to do was put together a plan, and the court "would entertain it." So Shah had the option to sell the stock, albeit with the court's approval. The defendants do not assert, and the record does not show, that he ever took advantage of this opportunity, notwithstanding his expressed desire to exert control over the stocks. The reason was revealed at sentencing: "Unfortunately, the market kept going down." Shah's actions and inaction show that he only wanted to exert control over the stocks when he stood to gain, not when he would sustain a loss.

As further evidence of Shah's lack of control over the securities, the defendants point to the Clerk's eventual initiation of the securities' sale, which they assert was without notice to or consultation with Shah, and the government's taking of the cash portion of the funds on deposit. They claim that the Clerk's action demonstrates the securities could have been sold at an earlier time without Shah's involvement. However, the defendants ignore a salient fact: all of these actions occurred *after* the district court had sentenced the defendants and entered judgment including the restitution order against them. The court did not order that the stocks on deposit be sold or direct Shah to sign any documents needed to effect the sales *before* it ordered restitution. Shah lost control over the stock when restitution was ordered,

not before. And Shah had notice of the impending sale—he was present at sentencing when the court ordered the Clerk to sell the stocks. Neither the district court, the Clerk, or the government exercised authority to remove the funds or securities on deposit *before* sentencing and entry of judgment. And any control that the Clerk had over the cash or securities before restitution was ordered was a result of Shah's agreement to deposit them with the Clerk as a showing of his acceptance of responsibility. The Clerk did no more than hold the cash and securities as per Shah's plea agreement.

The defendants' related argument is that "[o]nce the assets are surrendered or taken, subsequent events have no bearing on restitution values." They rely on *United States v. Burger*, for the rule that restitution in criminal cases can only be ordered for "actual damages flowing from the specific crime charged in the indictment of which the defendant is convicted." 739 F.2d 805, 811 (2d Cir. 1984); *see also Hughey*, 495 U.S. at 413. But no one disputes that the restitution order of $10 million reflects the victims' losses caused by the conduct of conviction. Similarly, neither *United States v. Smith*, 944 F.2d 618 (9th Cir. 1991), nor *United States v. Tyler*, 767 F.2d 1350 (9th Cir. 1985), helps the defendants. In these cases, at the time of sentencing, the victims had received some or all of the property illegally taken or some other compensation. *See Smith*, 944 F.2d at 625 (victims had received partial compensation for their loss through seizure of collateral property); *Tyler*, 767 F.2d at 1352 (stolen timber was returned to the government on the day of the theft). In contrast, here, the victims

received nothing before sentencing. Shah did not give the securities to the victims; he deposited them with the Clerk for future use toward payment of restitution. Without a restitution order, the court could not disburse the money to the victims. The defendants argue that Shah "was powerless to protect the securities from the vagaries of the market." Even if so, he could have protected the pool that was made available for restitution by depositing cash, not stocks, into the account. He chose stocks because "they were doing well" and he apparently wanted to reap their gains in the market. However, he does not want to bear the loss.

Now we come to the crux of the defendants' argument: the deposited securities were payments of restitution. The defendants claim that the language of Shah's plea agreement demonstrates that the stocks were the payment of restitution. But they overread the agreement as expressly providing that "restitution may be made by 'certified check, money order or stock certificates. . . .'" The agreement actually states: "The defendant will deposit the sum of $2,500,000 with the Clerk, U.S. District Court, by certified check, money order or stock certificates . . . . The clerk will hold this deposit in escrow. . . . The funds in escrow shall be used for the payment of any order of the Court for restitution to the victims of these offenses . . . ." This language does not provide that the stock certificates were payment of restitution. The language is forward-looking. Both the "in escrow" and "shall be used for the payment of any order . . . . for restitution" phrases belie the defendants' interpretation. The defendants do not offer any explanation as to how the stocks could be actual

payment of restitution when they were deposited long before the amount of restitution was determined by the court or ordered to be paid.

In arguing that the stocks were not security, the defendants assert that there was no reason to hold the funds as security. They point out that Shah had signed the plea agreement, pled guilty, and deposited the funds, and the government has broad authority under 18 U.S.C. §§ 3663-3664 to pursue funds in his possession to satisfy his sentence. The defendants fail to acknowledge the twin purposes of Shah's deposit of the funds: (1) to avoid the government's pursuit of forfeiture actions against his property, and (2) to demonstrate an acceptance of responsibility and earn the government's recommendation for a reduction in his guideline offense level by creating a pool of funds for restitution. The latter purpose was confirmed at the April 29, 2008, hearing.

The defendants argue that the district court misinterpreted defense counsel's remarks at that hearing as stating that Shah intended to make all payments by cash, including the already deposited securities. They assert that Shah's counsel described only how Shah would meet his remaining restitution obligations. Along similar lines, they claim that Shah intended to sell the stock in his personal possession, not the stock on deposit, to obtain additional amounts toward restitution. The defendants find support in counsel's assertion that Shah had posted $5.5 million in stock, and in every month for the next six months, he would make a payment of one-half million dollars, resulting in about $8 million or $8.5

million dollars in escrow at the end of six months. They argue that these figures add up only if the total includes the $5.5 million in securities already deposited.

The district court did not misinterpret defense counsel's statements. The AUSA clearly explained that Shah had agreed to a payment plan under which, by sentencing, "the full ten million dollars in cash; not in stock or other negotiable instruments" will be posted with the court and subject to be paid out as restitution to make the victims whole. Shah's attorney agreed that the parties had reached a restitution agreement and at no time objected to the assertion that $10 million in *cash* would be posted. Nor did defense counsel dispute that the end goal was to make the victims whole at the time of sentencing. The defendants knew that the stocks had not been sold and they had fallen in value to about $4.1 million. Although the math "doesn't add up" unless the value of the stock at the time of deposit rather than at the time of the April 29 hearing is included, the district court's interpretation is reasonable and accounts for the view, no doubt hoped for by Shah, that the stocks would re-gain some of their lost value.

We disagree that the government acknowledged that the cash and securities deposited by Shah and held by the Clerk "constituted restitution that had been paid." True, the government requested the court at sentencing to order that "any restitution . . . not being held by . . . the court clerk, be ordered to be paid within 30 days." This was not an acknowledgment that restitution had already been paid, but rather that Shah had agreed the funds on deposit would be used toward a restitution payment.

This understanding is consistent with paragraph 14 of Shah's plea agreement, which the AUSA referenced in making the above statement. The government simply recognized that the funds and stock on deposit were held as assurance for Shah's payment of a future order of restitution, and the future had arrived. It was time for the court to determine how much restitution was owed and to order Shah and Shah Engineering to pay it. Once restitution was ordered, not before, the funds and securities on deposit could be used to make restitution payments to the victims.

Furthermore, if Shah's stock deposits were restitution payments as of the time of their deposit with the Clerk, the defendants might have another problem. The Mandatory Victims Restitution Act ("MVRA") requires the court to order that the defendant make restitution to the victim(s) of the crimes in cases such as this. 18 U.S.C. § 3663A(a)(1), (c); *see United States v. Leahy*, 464 F.3d 773, 793 (7th Cir. 2006) (stating that MVRA requires restitution order for offense against property including offense committed by fraud). The MVRA also requires the court to determine the loss caused by the offense, *id.* § 3663A(b)(1)(B), which includes a deduction for "the value (as of the date the property is returned) of any part of the property that is returned," *id.* § 3663A(b)(1)(B)(ii); *see also United States v. Swanson*, 394 F.3d 520, 528 (7th Cir. 2005) (requiring deduction for value of property returned to victim and amount that defendant repaid to the victim before the indictment was returned).

If the stock deposits were restitution payments valued at $5.5 million, then the loss amount should have

been reduced to $4.5 million. Yet Shah agreed to a restitu-
tion amount of $10 million, and the defendants did
not object to that amount at sentencing. (No one made
any comments on Shah Engineering's behalf at sentencing.)
By accepting the restitution amount without objection
and not seeking a returned property deduction for
the value of the stock deposited, the defendants may
have waived any argument that the deposits were restitu-
tion payments that should have been credited toward
restitution. *See United States v. Staples*, 202 F.3d 992, 995
(7th Cir. 2000) (holding defendant waived right to appeal
his criminal history calculation by stating he had no
objection to the PSR). But the government raised
this waiver argument for the first time in its supplemental
brief, and thus has waived waiver. *See United States v.
Fields*, 371 F.3d 910, 916 n.3 (7th Cir. 2004); *United States
v. Caputo*, 978 F.2d 972, 975 (7th Cir. 1992). So we review
for plain error. *See United States v. Drake*, 456 F.3d 771,
776 (7th Cir. 2006).

There was no such error. Shah never returned any
property to the victims; he deposited the stock with the
Clerk. Thus, the securities cannot be said to have
been "returned" within the meaning of § 3663A(b)(1)(B)(ii).
*Cf. United States v. Shepard*, 269 F.3d 884, 887-88 (7th
Cir. 2001) ("So long as [the victim] regained beneficial
use of the property, it has been 'returned'" within the
meaning of the MVRA). Moreover, the defendants' failure
to object to the restitution amount ordered further supports
the conclusion that the defendants well understood
that the stock certificates on deposit were not themselves
restitution payments.

As the government asserts, "[i]f Shah's stock deposits had been restitution payments, then his interest in setting target prices for the 'stocks held in escrow' would have been both gratuitous and officious." The same holds true for Shah's request for an additional three years' time "to pay the agreed upon restitution" to allow the stocks time to regain their lost value and "be converted to cash in a better market." Similarly, Shah proposed a restitution order that provided for "[t]he Clerk's Office [to] take possession of all securities and cash currently being held in the escrow account," for "[t]he cash currently being held in the escrow [to] be immediately distributed to the agencies," and for "Shah [to] begin liquidating equities currently being held in escrow." If the stocks had been restitution payments, then the Clerk already would have total control of them, and Shah would have had no ability to liquidate or interest in the stocks. And, tellingly, at the last opportunity before sentencing, Shah requested that he either be given credit for the value of the stock and cash as of the time of deposit or to be given additional time to allow the stocks to appreciate in value. This reveals his understanding that the stocks were not restitution payments at the time of deposit. Shah sought the benefit from the stocks' appreciation and recognized that he needed time to meet his restitution obligation. The district court correctly found that "[t]he Defendants' claim that Shah made a [restitution] payment in 2007 simply does not comport with the facts."

If the deposited stock certificates weren't restitution payments, then what were they? The defendants contend that the district court erred in finding that the stock

was security for future restitution payments. A "security" is "[c]ollateral given or pledged to guarantee the fulfillment of an obligation; esp., the assurance that a creditor will be repaid. . . ." *Black's Law Dictionary* 1475 (9th ed. 2009). It makes sense to view the stock certificates as security for Shah's future payment of the anticipated restitution order. The plea agreement contemplated that Shah may be ordered to pay restitution; it also stated that the funds, whether certified check, money order, or stock certificates, on deposit would be used to pay the anticipated restitution order (and fine and special assessments). And at the plea hearing, the parties confirmed their intent to create a pool of funds from which restitution payments could be made. Shah deposited the stock and cash in an effort to assure the government that funds would be available to satisfy a restitution order absent any forfeiture actions. But for the deposited funds, the government likely would have initiated a forfeiture action to ensure that property was available to satisfy the restitution obligation or would have sought prejudgment attachment of Shah's property. *See* 18 U.S.C. § 3613(f) (enforcement of restitution order); 28 U.S.C. §§ 3101 (allowing government to seek prejudgment remedy), 3102(a) (providing that any property attached "may be held as security to satisfy such judgment . . . as the United States may recover"). Hence, Shah deposited the stock (and cash) with the Clerk to guarantee the fulfillment of his future obligation to pay a restitution order.

In arguing that the stocks were not security, the defendants rely on *United States v. Rosebush*, 45 F. Supp. 664 (E.D. Wis. 1942), for the proposition that "[t]he transfer

of possession of the stock, although unrecorded on the books of its issuing corporation, conveys the interest of the holder." *Id.* at 667 (citation omitted). *Rosebush* is inapposite because it actually involved a sale and transfer of stock to the buyer. And as *Rosebush* stated: "The essence of the transfer is the intent of the owner to transfer the title and ownership." *Id.* It is the intent of the owner, here, presumably Shah; not the recipient, the Clerk, that matters. The only reasonable inference from the record is that, at the time of deposit, Shah did not intend to transfer the title and ownership of the deposited securities. Indeed, the parties agreed that if the fine, restitution, and special assessments ordered did not exceed the amount on deposit, then the remainder, less interest to the Clerk, would be returned to Shah.

The defendants also argue that the stocks were not held in an escrow account. They assert, without any support, that "[t]here are no such things as escrows in criminal cases." But see *United States v. Lilly*, 206 F.3d 756, 758 (7th Cir. 2000), in which the government froze the defendant's and his wife's assets and forced the sale of some assets including their home, the proceeds of which were placed in an escrow account pending the government's investigation. Moreover, the plea agreement clearly identifies the funds on deposit, including the stock certificates, as "in escrow." The AUSA referenced the stocks and amounts held "in escrow." And Shah's counsel repeatedly referred to the stock and cash "held in escrow" and "the escrow," both at the April 2008 hearing and the June 2009 hearing as well as in

numerous pre-sentencing filings with the district court. Even the court described the stocks as being held "in an escrow account." Consistent with that understanding, the judgment ordered the "[s]tocks in escrow to be sold within 30 days."

The plea agreement also identifies a "triggering event" that authorizes the release of the funds, after which Shah could potentially regain the funds: a court order for restitution and payment of a fine. The funds were to be used "for the payment of any order of the Court for restitution" and the remainder was to be used "to pay the fine" imposed on Shah Engineering: "Once the fine, restitution, and special assessments ordered are fully satisfied, the remainder, if any, less the 10% accumulated interest, should be returned to the defendant." The defendants argue that Shah never contemplated that any funds would be returned to him. If so, that seems to be because the parties anticipated that the total restitution and fine would exceed the amount on deposit. And at Shah's plea hearing, the court confirmed that the parties agreed that any monies remaining on deposit after payment of restitution and a fine "would be returned to Mr. Shah." Even if criminal cases do not ordinarily involve escrows, Shah agreed to place a deposit in escrow in this case.

In sum, the language of the plea agreement, the parties' agreement as expressed and confirmed at Shah's plea hearing, in subsequent filings and hearings, and as demonstrated by Shah's conduct from the time of his plea through sentencing, all support the district court's

view that Shah, like the government, understood and intended that the stock be held in escrow as security for payment of the defendants' yet-to-be-determined restitution obligation. Therefore, the record supports the district court's finding that the stock was deposited in escrow as security for the defendants' restitution obligation.

This determination affects our conclusion with regard to who bore the loss for the securities' decline in value. In *Capos v. Mid-America National Bank of Chicago*, a borrower put up stocks as collateral for a loan and the stocks declined precipitously while the bank was holding them. 581 F.2d at 678. Capos brought a securities action against the bank, which counterclaimed for payment of principal and interest on the loans secured by the depreciated stock. *Id.* at 677. The district court entered judgment against Capos and in favor of the bank on the counterclaim. *Id.* Capos appealed, and we, looking to Illinois law and the Restatement of Security, held that "[t]he pledgee is not liable for a decline in the value of pledged instruments, even if timely action could have prevented such decline." *Id.* at 680-81 (quotation omitted). We noted: "At any point prior to the stock's value becoming less than the amount owed, Capos could have instructed the bank to sell the stock and liquidate the debt. Thereafter, he could have acquiesced in [the bank's] suggestion that the stock be sold. The loss in the stock's value was, quite simply, an investment loss, the investment was Capos', not [the bank's], and any negligence in not cutting the losses was *at least* equally his." *Id.* at 680.

The facts of *Capos* are similar to those here. The stocks Shah deposited fell in value. Shah doesn't want to bear the loss even though he knew the stocks were declining and failed to take any action. Of course, *Capos* was a civil action involving a private loan and Illinois law, whereas this is a criminal case. So *Capos* is merely analogous, not controlling. But the analogy is apt. Shah did not give up all control over the securities deposited. It is true that the plea agreement authorized the Clerk to invest the funds in an interest bearing account. But that didn't happen. And in any event, the order entered following the plea provided that "[i]f the deposits are made by depositing stock certificates, the Clerk of the Court shall hold such until further order of the Court." The defendants didn't object to this treatment of the stock. Like Capos, Shah could have requested the court to sell the stock; indeed, the court practically invited him to do so to avoid further diminution in value of the securities. Shah deposited the stock because it was "doing well" and he sought to capitalize on the continued appreciation. Otherwise, he could have, and likely would have, sold the stock and deposited cash instead. Contrary to the defendants' claim that deciding this appeal against them will "result in a substantial deterrent to the much favored advance payment of restitution and be contrary to public interest," our decision will encourage criminal defendants to deposit cash rather than securities in the event they wish to avoid the risk of the market.

### III.  Conclusion

The Notice of Appeal states that the defendants are seeking relief from the district court's January 15, 2010, order, but they are really appealing the restitution orders. Therefore, Shah's appeal waiver bars his appeal and his appeal is DISMISSED.

The district court correctly found that the stock was deposited into escrow as security for the defendants' payment of their anticipated restitution and fine obligations and not as actual restitution payments. We accordingly AFFIRM the district court's restitution judgment against Shah Engineering.