In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-4039

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ADAM R. RESNICK,

*Defendant,*

and

DOMENIC POETA,

*Third-Party Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:05-cr-00009-1—**Wayne R. Andersen**, *Judge.*

ARGUED DECEMBER 10, 2009—DECIDED FEBRUARY 2, 2010

Before POSNER, MANION, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This case presents issues arising from the government's efforts to collect a criminal defendant's financial obligations to the government from a third party who received money from

the insolvent defendant. Defendant Adam Resnick pled guilty to one count of wire fraud under 18 U.S.C. § 1343 for his role in a check-kiting scheme that caused the failure of Universal Federal Savings Bank. Under the plea agreement, Resnick would serve prison time and owe approximately $9.75 million in restitution to Universal's insurer, the Federal Deposit Insurance Corporation ("FDIC"). Resnick was insolvent, so the government invoked the supplemental procedures authorized by 18 U.S.C. § 3613 to collect some of the money from appellant Domenic Poeta.[1] Poeta was a bookie to whom Resnick paid significant sums of money to satisfy illegal gambling debts. After a bench trial in which Resnick testified and Poeta did not, the district court entered judgment for the government for $848,197.63 ($647,211.00 in check transactions from Resnick to Poeta, plus prejudgment interest of $200,986.63) under theories of fraudulent transfer under the Federal Debt Collection Procedure Act ("FDCPA") and common-law unjust enrichment. Poeta has appealed, and we affirm.

I. *The Facts*

Adam Resnick carried out a check-kiting scheme that led to the collapse of Universal Federal Savings Bank. With the help of two co-defendants, Antonette and Terrence Navarro, Resnick obtained signatory rights to a checking account at Universal, circumvented Univer-

---

[1] Poeta's first name is spelled in different ways in the record. We use his attorney's spelling, "Domenic."

sal's regulations, and gained access to millions of dollars. By the time the bank finally failed, Resnick had stolen approximately $10.5 million. The FDIC stepped in to protect depositors by paying approximately $9.75 million to cover the losses.

In the criminal prosecution against Resnick and the Navarros, Resnick reached a plea agreement with the government. Under the agreement, the district court sentenced Resnick to 42 months in federal prison and ordered him to pay $10,457,825.60 in total restitution, including $9,750,545.60 to the FDIC.

The government has been able to recover only a fraction of the restitution judgment against Resnick. Throughout his check-kiting scheme, Resnick held few assets and was insolvent. With each illicit withdrawal from Universal, Resnick became indebted to Universal for the amount of fraud proceeds he obtained. Accordingly, the government has sought to trace the proceeds of the scheme to recover the restitution owed by Resnick.

A significant portion of the funds that Resnick stole from Universal went toward feeding his remarkable gambling habit, including money that Resnick paid to appellant Domenic Poeta to satisfy illegal gambling debts. The government presented to the district court 16 checks totaling $647,211. All were drawn by Resnick on his Universal bank account and were made payable either to Poeta himself or to "cash" and were negotiated by Poeta.

Based on the criminal judgment against Resnick, the government initiated third-party proceedings against Poeta under the original criminal caption. Federal law allows the government to collect financial obligations under criminal judgments by using federal and state procedures for collecting civil judgments. 18 U.S.C. § 3613(a). On April 9, 2007, the government served a citation to discover assets directed to Poeta pursuant to Federal Rule of Civil Procedure 69 and 735 Ill. Comp. Stat. 5/2-1402. Pursuant to the citation, Poeta appeared in person with counsel on August 23, 2007 to be examined under oath as to Resnick's assets. When questioned about his gambling operations and his association with Resnick, Poeta repeatedly invoked his Fifth Amendment privilege against self-incrimination.

The government then filed a petition for relief against Poeta, alleging that Resnick had defrauded Universal of approximately $10.5 million and had used some of that money to pay Poeta for illegal gambling debts. The petition alleged that the transfers from Resnick to Poeta were fraudulent because they were not supported by consideration (an illegal gambling contract provides no value), and that Resnick was insolvent and indebted to his victim Universal at the times of the transfers. The government alleged both intentional fraudulent transfer and constructive fraudulent transfer under 28 U.S.C. §§ 3304(b)(1)(A) and (B)(ii), respectively. The government later added a third theory of unjust enrichment. As a remedy, the government sought $647,211, plus prejudgment interest.

Poeta's answer to the government's petition failed to deny any facts relevant to the government's theories of recovery. Poeta either admitted the allegations, claimed insufficient information to admit or deny them, or invoked his Fifth Amendment privilege against self-incrimination.

Given the perceived lack of factual dispute, the government filed a motion for judgment on its petition. Poeta responded by filing a motion to strike the government's motion. Poeta argued that Resnick never rightfully owned the money that he transferred to Poeta, from which Poeta concluded that the money was not properly the subject of a fraudulent transfer claim. Poeta also argued that he had not received sufficient discovery from the government to defend the claims against him.

On June 6, 2008, the district court held a trial to resolve the pending matters. The government offered the testimony of Adam Resnick and six exhibits. Poeta called three witnesses but did not testify himself. The district judge heard oral argument on June 30 and July 2, 2008. On July 23, 2008, the district judge orally announced that he was finding for the government for the full amount sought, $647,211 plus prejudgment interest of $200,986.63, for a total of $848,197.63. The district court entered this judgment in writing on July 31, 2008, but then vacated that judgment on August 6, 2008. See R. 142, 143, 144. The district court asked the government to submit draft findings of fact and conclusions of law, and the government did so. Poeta filed objections and submitted an alterative set of findings and conclusions, seeking

setoff from the final judgment for money he had paid to Resnick in gambling winnings. Poeta later filed supplemental proposed conclusions of law in which he advanced for the first time the affirmative defenses of contributory negligence and failure to mitigate damages.

On September 24, 2008, the district court issued its Findings of Fact and Conclusions of Law. The district court found that the government had established Poeta's liability on the alternative theories of constructive fraudulent transfer and unjust enrichment. The court declined to decide whether Resnick was ever the "lawful owner" of the funds he transferred to Poeta. If he was the owner, the district court reasoned, the government could recover for fraudulent transfer, and if he was not, the government could recover for unjust enrichment. Also on September 24, 2008, the district court entered a new judgment against Poeta for the total sum of $848,197.63. See R. 155, 156, 157.

Poeta moved to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e). His motion reargued the issues of ownership, mitigation of damages, and contributory negligence. The motion also asserted for the first time that the post-judgment supplementary proceedings were not the appropriate vehicle for adjudicating the government's claims and had denied him due process of law. The district court denied this motion, and Poeta has appealed.

II. *Ownership and Fraudulent Transfer Under the FDCPA*

To establish Poeta's liability for constructive fraudulent transfer under the FDCPA, the government was required to show that the judgment debtor Resnick:

> ma[de] the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation; [and]

> intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

28 U.S.C. § 3304(b)(1)(B)(ii).

Resnick's payments to Poeta satisfied the first element because an illegal gambling obligation has no legal value. Under Illinois law, all obligations incurred through illegal gambling are null and void, and any such obligation may be set aside and vacated. Illinois Loss Recovery Act, 720 Ill. Comp. Stat. 5/28-1, 28-7. The second element was also satisfied because Resnick certainly should have believed that he was incurring debts beyond his ability to pay when he defrauded Universal of millions of dollars, in large part to feed his gambling habit. Poeta does not dispute these two elements, but he argues that Resnick made no "transfer" to him within the meaning of the FDCPA because Resnick never legally owned the (stolen) money he paid to Poeta.

The FDCPA specifies that a "transfer is not made until the debtor has acquired rights in the asset transferred."

28 U.S.C. § 3305(4). Poeta argues that since Resnick acquired the money through fraud, he was never the legal "owner" of any funds that he transferred from the Universal account. Therefore, the argument goes, section 3305(4) places Resnick's payments to Poeta outside the scope of the FDCPA, so that Poeta cannot be found liable on a fraudulent transfer theory.[2]

The FDCPA's fraudulent transfer provisions are not written in terms of legal and rightful ownership. The key statutory inquiry here is whether Resnick had "rights in the asset transferred." There is no doubt that Resnick fraudulently obtained the money he transferred to Poeta. His fraud does not mean that he lacked any "rights" in the money, including the power to transfer it. As a practical matter, he had full power to draw on the Universal account and to transfer the money to others. Resnick used this power to defraud the bank, but this power was obtained by observing the legal formalities. Poeta's assertion that Resnick was not a legal signatory is incorrect—while Resnick skirted Universal's private rules for obtaining drawing authority, nothing in the

---

[2] Poeta points to two excerpts—one from the district court's oral decision and one from its final written opinion—to show that the district court explicitly found that Resnick did not own the money he transferred from his Universal account. In both passages, the district court was merely summarizing Poeta's position, not adopting it. The district court specifically declined to adopt Poeta's argument that Resnick did not own the money he transferred to Poeta. See R. 155, ¶¶ 17, 37.

record indicates that his drawing authority itself was illegal. It was his use of that authority that was criminal.

We find that the requirement of "rights in the asset transferred" was satisfied here because Resnick had possession of the money he delivered to Poeta. The fact that the victims of the fraud had greater rights in the assets that were transferred does not work to shield Poeta from this collection effort. It would be odd to interpret the statute, enacted to provide a remedy for the benefit of one of those victims, to give greater rights to someone in Poeta's position—a bookie receiving stolen money from a criminal—than to others who receive money without giving adequate consideration in more innocuous circumstances.

Although Resnick was not the legal and rightful owner of the funds transferred in the course of his fraudulent scheme, he had the legal right to draw on the account at Universal and the power to transfer the funds at issue, subject to the rights of victims to pursue remedies later. Resnick's transfers of money to Poeta fall within the scope of the FDCPA, and Poeta is liable to the government for the constructively fraudulent transfers. This court need not reach the district court's alternative theory of unjust enrichment.

III. *Use of Supplementary Proceedings*

Poeta argues that supplementary proceedings are inappropriate for both a fraudulent transfer claim and an unjust enrichment claim, and that he should have

been able to defend the government's claim in a separate civil action with the full panoply of pretrial and trial procedural rights. Poeta first advanced this argument in his motion to alter or amend judgment, after the district court had already ruled against him on the merits. Poeta's failure to raise his procedural objections earlier, when any problem could have been remedied by the district court, amounts to a waiver and precludes this challenge on appeal.

A motion to alter or amend judgment under Federal Rule of Civil Procedure 59(e) may be used to draw the district court's attention to a manifest error of law or fact or to newly discovered evidence. *E.g.*, *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). A Rule 59(e) motion "does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Id*. We use a deferential standard when reviewing denials of Rule 59(e) motions and will reverse only if the district court abused its discretion. *LB Credit Corp. v. Resolution Trust Corp.*, 49 F.3d 1263, 1267 (7th Cir. 1995) (affirming denial of Rule 59(e) motion that had first presented argument after district court had ruled against appellant on the merits; new argument had been waived).

Poeta failed to make any argument challenging the appropriateness of supplemental proceedings until after the district court had conducted a trial and entered final

judgment against him. A Rule 59(e) motion does not provide Poeta an opportunity to remedy this procedural failure. See *Bordelon*, 233 F.3d at 529 (affirming denial of Rule 59(e) motion attempting to correct procedural omissions). Apart from genuinely jurisdictional issues, a party may not litigate a controversy to completion and then challenge the forum or its procedures only after he has received an unfavorable final judgment. The district court did not abuse its discretion when it denied Poeta's Rule 59(e) motion.[3]

Even if Poeta's challenge to the supplemental proceedings had been timely, he has not shown how the proceedings violated his due process rights. Poeta had ample notice and an opportunity to be heard. He presented evidence and argument on his own behalf, but the government's evidence was stronger. Poeta also claims that his inability to implead Terrence Navarro and Larry Elisco, the other two individuals with access to Resnick's account at Universal, violated his due process rights. These two individuals have nothing to do with the money at issue in this case. The money in question consists only of payments made directly from Resnick to

---

[3] Poeta contends that he raised the issue in closing arguments. Even if that were timely, which it was not, the quoted portion of closing arguments addressed the substantive ownership issue discussed above, not the procedures used to resolve the issue. The closing argument transcript reveals no challenge to the supplemental proceedings. Such a challenge was also absent from Poeta's written filings submitted before final judgment.

Poeta. Even if Navarro and Elisco shared criminal or civil responsibility for Resnick's fraud, the facts show that Resnick himself delivered hundreds of thousands of dollars to Poeta to pay illegal gambling debts. Those were fraudulent transfers, and the government was entitled to seek relief from Poeta alone.

Poeta also complains of his inability to discover certain "critical elements of the case," such as Resnick's financial condition and his initial statement to the FBI, which Poeta suggests could have been used to impeach Resnick. These "critical elements" are in fact irrelevant given the lack of factual dispute in this case regarding Resnick's payment of illegal gambling proceeds to Poeta. Poeta has never denied, much less proffered evidence to controvert, the fact that Resnick paid him $647,211 in illegal gambling losses. Nor is there any doubt about Resnick's insolvency as he accumulated massive debts to the bank he was looting.

Finally, Poeta claims that he was denied the right to trial by jury. He never asked for a jury. If Poeta thought he had a right to trial by jury, Federal Rule of Civil Procedure 38(b) required him to serve the government with a written demand for trial by jury within 10 days (at that time) of filing his response to the government's petition for relief. His failure to do so waived his right to trial by jury. See Fed. R. Civ. P. 38(d); *Members v. Paige*, 140 F.3d 699, 701 (7th Cir. 1998). "[F]ailure to object to a non-jury factfinding proceeding waives a valid jury demand as to any claims decided in that proceeding, at least where it was clear that the court intended to make

fact determinations." *Lovelace v. Dall*, 820 F.2d 223, 227 (7th Cir. 1987). Poeta did not state his desire for trial by jury until after the court had entered judgment against him, and it was always clear that the district court intended to make fact determinations. Poeta waived any arguable right to trial by jury in this action.

IV. *Affirmative Defenses*

Poeta also argues that the district court erred by rejecting his affirmative defenses of contributory negligence and failure to mitigate damages. Poeta first raised these affirmative defenses after the district court had stated its intent to rule against him on the merits, when Poeta submitted supplemental proposed conclusions of law. This was too late to raise new affirmative defenses as a matter of right. The district court did not abuse its discretion by rejecting these defenses raised for the first time after the trial had concluded and after the court had stated its intention to rule against Poeta.

Poeta also asserts that the money judgment against him should be subject to setoff by subtracting three payments that he says he made to Resnick on winning bets from the amount that Resnick paid him on losing bets.[4] The

---

[4] The three payments were supposedly in the amounts of $50,000, $70,000, and $2.2 million. Resnick testified to the $50,000 payment, and a letter from the FDIC shows the $70,000 payment. To prove the $2.2 million payment, however,

(continued...)

problem for Poeta is that neither federal nor Illinois law supports a subtraction of offsetting payments on other illegal gambling debts from the judgment against Poeta. Poeta argues that he should receive "equitable consideration" for the payments made to Resnick, despite the illegal nature of their gambling arrangement. To support this contention, Poeta points to *United States v. Santos*, 553 U.S. ___, 128 S. Ct. 2020 (2008), a Supreme Court decision interpreting the word "proceeds" in the federal money laundering statute, 18 U.S.C. § 1956(a), to mean "profits," and not gross "receipts" when there is no legislative history to the contrary. *Id.* at 2031.[5] Poeta

---

[4] (...continued)

Poeta provides only excerpts from Resnick's fictionalized book describing his struggle with gambling addiction. These colorful book excerpts were certainly hearsay, and even if they were taken at face value, they would not support a finding that Poeta paid $2.2 million of his own money to Resnick. According to the fictional text provided to the court, any payment of this amount would have come from an offshore operation (the book refers to "the guys in Antigua"), not from Poeta's account. The fictionalized excerpts also fail to indicate that the payment was made at all. They indicate only that the sum was owed to Resnick. See App. F. If we were to consider any offset, it would be in the amount of $120,000, the total of the two smaller payments.

[5] Poeta actually focuses on the earlier *Santos* opinion by this court, 461 F.3d 886 (7th Cir. 2006), and a prior Seventh Circuit case, *United States v. Scialabba*, 282 F.3d 475 (7th Cir. 2002). The Supreme Court's analysis was substantially similar to this

(continued...)

concludes that he should be liable only for the net profit he received from Resnick.

Unlike *Santos*, this case does not require interpretation of an ambiguous statutory term. See *Santos*, 128 S. Ct. at 2024. No ambiguity of terms exists here, and Poeta does not argue otherwise. The *Santos* Court's decision to construe "proceeds" to mean profits and not gross receipts rested entirely on the rule of lenity. See *id*. at 2025-34. The *Santos* Court summarized the function of the rule of lenity:

> The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. This venerable rule . . . vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed.

*Id*. at 2026 (citations omitted). The present case deals with section 3304(b) of the FDCPA, a law that suffers from no ambiguity here: it applies to transfers from a debtor to a third party, not those going in the other direction. Nor does section 3306(a) (providing the remedies available to the judgment creditor) impose criminal liability or punishment on the transferee. It simply allows the court to order that the transfer be unwound. See 18 U.S.C. §§ 3304(b), 3306(a).

---

[5] (...continued) court's, and the Supreme Court's *Santos* opinion is the most recent and most authoritative word on the matter. We restrict our analysis to the Supreme Court's *Santos* decision.

In its effort to collect from Poeta, the government may rely on both federal and state law. See 18 U.S.C. § 3613. The Illinois Loss Recovery Act applies here, and it deems void all of the illegal gambling transfers at issue, in either direction. 720 Ill. Comp. Stat. 5/28-7. Section 28-8 of the Act provides a cause of action by which anyone may sue on behalf of an illegal gambling loser to recover from the winner the total amount lost:

> (a)  Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value . . . .

> (b)  If within 6 months, such person . . . does not in fact pursue his remedy, any person may initiate a civil action against the winner.

*Id*. at 28-8. The statute provides for recovery of all that is lost, not the net of the gambling exchanges. The Illinois Supreme Court long ago explicitly rejected an attempt to use winning payments as a setoff, reading a prior version of the statute to refer to recovery of every instance of loss and not to the net loss over some extended period of time. *Johnson v. McGregor*, 157 Ill. 350, 352-53, 41 N.E. 558, 559 (Ill. 1895). The purpose of the statute is not simply to undo illegal gambling transactions but "to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism." *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997). Accordingly, Illinois law voids all of Resnick's illegal gambling payments to Poeta and bars Poeta's belated setoff defense.

The judgment of the district court is AFFIRMED.