In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 13-2040, 14-1824, & 14-1980

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SUSHIL A. SHETH,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Northern District District of Illinois, Eastern Division.
No. 09 CR 69-1 — **Rebecca R. Pallmeyer**, *Judge.*

SUBMITTED APRIL 8, 2014[*] — DECIDED JULY 18, 2014

Before EASTERBROOK, ROVNER, and WILLIAMS, *Circuit Judges.*

PER CURIAM. Sushil Sheth, a cardiologist, pled guilty in 2009
to an information charging a single count of healthcare fraud.
*See* 18 U.S.C. § 1347. As agreed by Sheth, the district court
entered an order of criminal forfeiture for cash and investment

---

[*] We have consolidated Sheth's various appeals in this matter for our
review. After examining the briefs and the record, we have concluded that
oral argument is unnecessary. Thus the appeals are submitted on the briefs
and the record. *See* FED. R. APP. P. 34(a)(2)(C).

accounts then valued at roughly $13 million plus real estate and a vehicle. The government represented that the forfeited assets represented the proceeds of Sheth's fraud, which the parties had calculated to be approximately $13 million. Sheth's plea agreement specifies that forfeited assets would be credited against the amount of restitution, which the district court had determined to be $12,376,310. In September 2012, however, before the government had liquidated all of the forfeited assets or disbursed any of the proceeds to the victims, it sought more of Sheth's assets to apply to restitution. Sheth objected, arguing that the forfeited assets in the government's possession were enough to satisfy the order of restitution. Without resolving the parties' factual dispute, the district court ordered turnover of the assets, which were held by third parties. Sheth filed an appeal of that ruling, which was docketed as No. 13-2040. We conclude that the court erred by ordering turnover of the assets without first allowing for discovery and holding an evidentiary hearing. We therefore vacate the court's turnover orders and remand for further proceedings. Sheth also has filed two more appeals from later related rulings. Those appeals have been docketed as Nos. 14-1824 and 14-1980, and consolidated with the first appeal. On remand, the district court also should address any properly raised issues related to those appeals.

The government learned of Sheth's fraud in 2006, when one of his colleagues brought a qui tam suit against him under the False Claims Act, *see* 31 U.S.C. § 3730(b), and Illinois's Whistleblower Reward and Protection Act, *see* 740 ILCS § 175/4(b). The United States intervened in the suit and also initiated a criminal investigation. Sheth's plea agreement lists the prop-

erty subject to forfeiture and provides "that any payments made in satisfaction of the forfeiture judgment shall be credited to any outstanding restitution judgment." Contemporaneously with Sheth's sentencing in August 2010, a $20 million consent judgment in favor of the United States was entered in the civil suit. One of the terms of the civil settlement is that "[a]ny amounts paid to the United States as criminal restitution in the criminal case … against Sheth shall be credited against the" $20 million civil judgment.

Six months after Sheth's sentencing, the government had not liquidated all of Sheth's forfeited assets, and neither had the government distributed any proceeds of liquidated assets to the victims. Nonetheless, the government began postjudgment proceedings under the existing criminal docket number to discover other assets belonging to Sheth and to collect those assets in satisfaction of the restitution amount. *See United States v. Lee*, 659 F.3d 619, 620 (7th Cir. 2011) (explaining that district courts may entertain postjudgment collection proceedings within underlying criminal case). The government elected to use state collection procedures, as permitted by federal law when collecting restitution. *See* 18 U.S.C. §§ 3664(m)(1)(A)(I), 3613(a), (f); *United States v. Resnick*, 594 F.3d 562, 565 (7th Cir. 2010). It served citations on ten financial-services companies, *see* 735 ILCS § 5/2-1402(a), informing those third parties about the order of restitution and stating that $12,395,563 remained unpaid. (This is $19,253 more than Sheth was ordered to pay in the restitution order.) The service of such citations initiates supplementary proceedings during which the court may compel a third party in possession

of the judgment debtor's assets to turn over the assets to the judgment creditor to satisfy an unpaid judgment. *See* 735 ILCS § 5/2-1402(a)–(c); ILL. S. CT. R. 277(b); *Dexia Crédit Local v. Rogan*, 629 F.3d 612, 622 (7th Cir. 2010); *Workforce Solutions v. Urban Servs. of Am., Inc.*, 977 N.E.2d 267, 275 (Ill. App. Ct. 2012). The government received written answers from the third parties and learned that five of them held assets belonging to Sheth—four brokerage accounts and one 401(k) plan. At the time the citations were served (April and May of 2011), the total value of these assets was $281,102.

In September 2012—18 months after learning of these accounts—the government asked the district court to order the third parties to liquidate Sheth's investments and turn over the proceeds to the clerk of the court. The government stated in its motion that Sheth owed $12,203,370 in restitution, with interest accruing. (This amount is $192,193 less than the balance listed on the citations and $172,940 less than the amount in the order of restitution. These discrepancies are puzzling, since the government had not yet distributed any funds to the victims.) At a hearing in September 2012, Sheth's lawyer requested that the government provide an accounting of the assets that had been forfeited. The government responded that it could say "with some surety [sic]" that the United States Marshals Service was holding $9 million in forfeited assets. The government also stated that it intended to distribute that money to the victims but that it wanted Sheth's additional assets turned over so that it could "know exactly how much money" it had before distributing any funds to the victims. The court set a briefing

schedule and ordered the government to provide an accounting of the forfeiture proceeds.

In January 2013 the government sent Sheth a two-page list of the forfeited assets. The government's lawyer asserted in an e-mail to Sheth's lawyer that the government held $9,989,320 of liquidated assets and additional, unliquidated assets that it estimated to be worth $1.3 million—a total of approximately $11.3 million. The government's lawyer added, however, that the unliquidated assets might actually be worth "substantially less," but he offered no basis for this conclusion or for the stated valuation. The government's lawyer further represented in his e-mail that "the $12.2 million judgment remain[ed] completely unsatisfied" because, "for some complicated reason" that counsel did not articulate, the forfeited funds could not be distributed to the victims before the turnover orders were issued.

After receiving the government's list of assets, Sheth objected to the turnover motion. He argued that the government's valuation was incomplete and inaccurate because it did not credit him for earnings on liquid assets (the government had taken possession six years earlier of bank accounts valued at $6.5 million) and did not include a valuation for several forfeited assets. Sheth also insisted that he was entitled to a detailed accounting and to documentation of the government's sale of certain assets, including real estate. Last, he contended that, if the government's valuation *was* correct, the government held almost $10 million in assets, and his current restitution balance was therefore approximately $2.5 million, not $12.2 million as the government maintained.

The government replied that Sheth's arguments were "merely speculation" and reassured the district court that it should not be troubled by the possibility of over-collection because any surplus would be applied to the $20 million civil judgment. And, the government maintained, even if Sheth satisfied the order of restitution *and* the civil judgment, the government "could apply any further surplus to the defendant's $13 million forfeiture judgment, which remains unsatisfied because all the assets seized pursuant to the forfeiture warrant in this case were applied to the restitution judgment." The government's lawyer, though, did not identify what legal authority would permit collecting the $13 million forfeiture judgment *twice*, or how this collection argument could be reconciled with the promise made in the plea agreement to credit "any payments made in satisfaction of the forfeiture judgment" against the order of restitution, which never exceeded $12.4 million. Neither did the government's lawyer identify legal authority for his proposal to apply any surplus against the civil judgment. The government did not deny that the funds in its possession were accruing earnings but asserted, again without citing authority, that it was not required to credit any earnings to Sheth and that, in any event, "the issue is not germane to the present motion." The government also stated that Sheth could not be credited the value of the unliquidated assets and that—regardless of the total value of the assets that the government was holding—the balance due on the order of restitution would remain the full amount until the government transferred the funds to the clerk of the court, which it would not do until the resolution of the turnover motion.

The district court conducted another hearing on the turnover motion in March 2013. Sheth's lawyer requested that the government be required to produce evidence to "back up" its valuation. He argued that it was unfair for the government to hold the assets for years while asserting that interest was accruing on the entire amount of restitution. The government's response was that its two-page list of assets was an "extensive" inventory and that Sheth's arguments were irrelevant because, but for the plea agreement, the government would not have had to credit Sheth's forfeited assets toward restitution and, thus, Sheth *could* have been criminally liable for a total of more than $25 million. The Illinois procedures governing these supplementary proceedings require a court to resolve parties' factual disputes through discovery and an evidentiary hearing. *See* ILL. S. CT. R. 277(e) (stating that in proceedings under 735 ILCS § 5/2-1402, "[a]ny interested party may subpoena witnesses and adduce evidence as upon the trial of any civil action"); *Dexia Crédit*, 629 F.3d at 618–19; *Workforce Solutions*, 977 N.E.2d at 275–77. Instead, the judge ordered supplemental briefing.

The government then gave Sheth documentation of the sale of forfeited land in Arizona but provided no further evidence in support of its valuation. Later, the government's lawyer sent Sheth's lawyer another e-mail. The government had recently liquidated some of the assets and, according to its lawyer, "the most optimistic view" of the total value of the assets in the government's possession was now roughly $11.15 million—$1.16 million *more* than the valuation the government had provided only six months earlier. This total included two

investments that Sheth had purchased for $550,000, which the e-mail valued at the purchase price. The e-mail also showed another investment that Sheth had purchased for $250,000, which the e-mail valued at zero because, the government's lawyer asserted, that investment had "been deemed worthless."

At the final hearing on the turnover motion, Sheth's lawyer again argued that the government's valuation was "haphazard" and that still the government had not supplied substantiation for its numbers. Sheth's counsel also maintained that the $20 million civil judgment was irrelevant because the government had moved to collect under the Mandatory Victims Restitution Act, *see* 18 U.S.C. § 3613(a), and thus the government and the court had no right to bring the $20 million civil judgment "into play." The government responded that Sheth was "only" losing $200,000 because this was "the only money that the government found that wasn't linked to his fraud." The judge granted the motion for turnover, concluding that she had not "heard any basis upon which to sustain an objection" to the motion. The judge reasoned that there was no point in having another hearing because all of the money would ultimately be "scooped up by the government" to satisfy the $20 million civil judgment.

Three weeks later, Sheth filed a timely notice of appeal. *See* FED. R. APP. P. 4(a)(1); *Lee*, 659 F.3d at 620–21. He then moved for a stay of the turnover orders pending appeal, but by then the third parties had liquidated and transferred the funds to the clerk of the district court. The government agreed not to distribute those funds—totaling $300,738 (approximately

$20,000 more than when the government discovered the assets two years earlier)—pending appeal. The government did, however, move to transfer the funds it had obtained thus far by liquidating the forfeited assets, $10,371,661 "plus any interest that has accrued," to the clerk for distribution to the victims. (The government did not explain why it was now requesting that the accrued interest be distributed to the victims when previously it had maintained that the interest earned would not be credited toward Sheth's order of restitution.) The government attached an updated list of assets to its motion, this time valuing the investments that Sheth had purchased for $550,000—which the government still had not liquidated—at zero. The court granted the motion.

On appeal, Sheth repeats the arguments he made below, challenging the district court's conclusion that there was no point in resolving the parties' factual dispute because his assets not subject to forfeiture would eventually end up in the hands of the government anyway. The government continues to insist that Sheth's objections to the turnover motion are baseless because any amount it collects to satisfy the order of restitution may be applied to either the $20 million civil judgment or the $13 million forfeiture judgment.

The government's contention—relied on by the district court—that it can collect the $20 million civil judgment through the provisions of the Mandatory Victims Restitution Act is incorrect. In general, the Federal Debt Collection Procedures Act "provides the exclusive civil procedures for the United States … to recover a judgment on a debt." 28 U.S.C. § 3001(a). That Act states that other collection procedures may apply if

"another Federal law supplies procedures for recovering on a claim or a judgment for a debt arising under such law," *id.* § 3001(b), but the government has identified no other federal law that governs the collection of the civil judgment in this case. Sheth maintains that the disputed accounts cannot be collected in satisfaction of the civil judgment because they are retirement accounts that are protected by ERISA's anti-alienation provision. *See* 29 U.S.C. § 1056(d). The government responds by stating that "'retirement funds' are not exempt from a *criminal judgment*" (emphasis added). This statement is correct but irrelevant. While we have recognized that the Mandatory Victims Restitution Act supersedes anti-alienation provisions so that retirement accounts may be used "as a source of funds to provide *restitution*," *United States v. Hosking*, 567 F.3d 329, 334 (7th Cir. 2009) (emphasis added), we did so because the Act itself provides that, "[n]otwithstanding any other Federal law … , a judgment imposing a fine may be enforced against all property or rights to property of the person fined," 18 U.S.C. § 3613(a). The government provides no legal authority stating that the *civil* judgment in favor of the government can be collected notwithstanding ERISA's anti-alienation provision.

The government's assertion that it could have seized the five accounts in satisfaction of the $13 million forfeiture judgment also is unconvincing. The five accounts at issue are not listed in the forfeiture order. *See* 18 U.S.C. § 982(b)(1); 21 U.S.C. § 853(g). True, the sentencing judge is allowed "to make the forfeiture order in personam rather than in rem, so that it is a personal judgment against the defendant rather than a

claim to specified assets." *United States v. Navarette*, 667 F.3d 886, 887 (7th Cir. 2012); *see United States v. Newman*, 659 F.3d 1235, 1242–43 (9th Cir. 2011) (explaining that "a money judgment is a proper form of criminal forfeiture"). But the government identifies no authority that permits the use of the Mandatory Victims Restitution Act to collect the balance due on such a forfeiture judgment, and "[i]t is not the court's responsibility to research the law and construct the parties' arguments for them." *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008). Perhaps the government believes that the five accounts qualify as substitute property, *see id.* § 853(p), but, if so, the government must obtain an order of forfeiture or amend an existing order of forfeiture to include the accounts. *See* FED. R. CRIM. P. 32.2(e); *United States v. Gordon*, 710 F.3d 1124, 1165–66 (10th Cir. 2013); *United States v. Duboc*, 694 F.3d 1223, 1226–27 (11th Cir. 2012).

The government also argues that the plea agreement is silent about how Sheth's property is to be divided between restitution, forfeiture, and the civil judgment, and thus it is free to first collect and apply other assets to the order of restitution and only then pay off the balance due with forfeited assets. What the government means by this, as far as we can tell, is that honoring its plea agreement with Sheth is optional. "[W]e interpret a plea agreement based on the parties' reasonable expectations and construe ambiguities against the government as the drafter." *United States v. Munoz*, 718 F.3d 726, 729 (7th Cir. 2013). By the government's logic, if the five accounts it sought from the third parties had been worth $12.4 million rather than approximately $300,000, the government could

have seized those accounts, liquidated them, used the $12.4 million to completely pay off the restitution judgment, and simply kept the more than $10 million in proceeds from forfeited assets. Rather than being a reasonable reading of its plea agreement with Sheth, the government's argument reads out of the agreement its unambiguous promise "that any payments made in satisfaction of the forfeiture judgment *shall be credited* to any outstanding restitution judgment" (emphasis added). Furthermore, the government's contention that it could hold the forfeited funds indefinitely until all of Sheth's other assets were collected is inconsistent with the right of victims to "full *and timely* restitution as provided by law." 18 U.S.C. § 3771(a)(6) (emphasis added); *see* U.S. DEP'T OF JUSTICE, ATTORNEY GENERAL GUIDELINES FOR VICTIM AND WITNESS ASSISTANCE 42 (2011).

Perhaps the government was worried that, if it did not seize Sheth's other assets as quickly as possible, he would attempt to move them out of its reach. But this concern is easily addressed. The Illinois statute that the government used in its collection efforts empowers the judgment creditor and the court to prevent—by citation or injunction—a third party in possession of the judgment debtor's assets "from making or allowing any transfer" or disposing of the assets. *See* 735 ILCS § 5/2-1402(f). Thus, the assets can be frozen until further order of the court or the termination of the proceeding, whichever occurs first. The proceedings do terminate automatically, but the court can "grant extensions … as justice may require." ILL. S. CT. R. 277(f). Therefore, once the government initiated

supplementary proceedings, it easily could have ensured that Sheth's assets stayed put.

The government also argues that, for purposes of determining the balance due on Sheth's restitution judgment, the value of Sheth's unliquidated forfeited assets is irrelevant. The government relies on *United States v. Robers*, 698 F.3d 937 (7th Cir. 2013), *aff'd*, --- S. Ct. ---, 2014 WL 1757835 (May 5, 2014), in which a defendant argued that the sentencing court was required to reduce the amount of his criminal restitution order by the fair market value of real estate collateral that he had given to the victims. *Id.* at 939. We rejected that argument, stating that "what matters is when at least part of the cash was returned to the victims." *Id.* at 942. But *Robers* dealt with 18 U.S.C. § 3663A(b)(1), which provides the method for calculating the victims' loss *at sentencing*. Thus, our conclusion in that case was based on the "plain language of the statute." *Robers*, 698 F.3d at 942. We said nothing about how properly to determine the balance due on an order of restitution when, as here, a defendant asserts during postjudgment proceedings that the government is over-collecting. The other case that the government relies on, *United States v. Shah*, 665 F.3d 827, 837 (7th Cir. 2011), also deals with defendants who disputed "that restitution was computed correctly at the time their sentences were imposed." In that case, we determined that the stocks the defendant had given to the government before judgment were security—not payment—for his undetermined restitution obligation and thus the defendant bore the loss for the securities' decline in value. The government does not explain why *Robers* and *Shah* are relevant here.

Nor can we rely on the government's assurances that Sheth was not harmed because the forfeited assets are $2 million short of satisfying his restitution obligation. The government still holds unliquidated investments of undetermined value. It could be that these investments are, as the government asserts, worth far less than $2 million. But the list of assets provided by the government shows that some of Sheth's investments were liquidated at *five times* what Sheth paid for them. Even crediting the government's assertion that one of Sheth's unliquidated investments is a total loss, the government is still in possession of investments that Sheth purchased for $550,000. It is at least possible that these investments are worth substantially more than what he paid.

But this is a factual dispute that the district court, after allowing for discovery, should have resolved before ruling on the turnover motion. The government elected to enforce the restitution judgment in accordance with Illinois law. *See* 18 U.S.C. § 3613(a). And under Illinois law, Sheth was entitled to discovery and an evidentiary hearing when he asserted a defense to the government's collection effort. *See* ILL. S. CT. R. 277(e); *Dexia Crédit*, 629 F.3d at 618–19; *Workforce Solutions*, 977 N.E.2d at 275–77. Sheth did not stipulate to the facts or waive his right to discovery or an evidentiary hearing. *See Workforce Solutions*, 977 N.E.2d at 277. To the contrary, at every stage of the supplemental proceedings, he demanded more evidence and insisted that the government could not back up its valuation. Thus, the district court erred by resolving these disputes on the briefs.

Accordingly, we VACATE the turnover orders and RE-MAND to the district court for further proceedings consistent with this opinion. The disputed funds must remain with the clerk of the court until the district court resolves the parties' factual disputes and determines whether Sheth is entitled to any further relief. We withhold judgment on the other issues that Sheth has raised in his consolidated appeals, including the denial of his motion requesting appointed counsel and the district court's grant of a judicial deed to Anita Sheth. We return the entire matter to the district court, noting that it also should address any further issues that Sheth has properly raised.