In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2741

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SUSHIL A. SHETH,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:09-cr-00069-1 — **Rebecca R. Pallmeyer**, *Judge.*

ARGUED JANUARY 16, 2019 — DECIDED MAY 13, 2019

Before BAUER, ROVNER, and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge.* Dr. Sushil Sheth amassed significant wealth as a cardiologist, but, as he later admitted in a plea agreement, he did so in a scheme to overbill government and private insurers by approximately $13 million. In his plea agreement he agreed to forfeit $13 million in assets as a condition of his plea. The United States, in turn, allowed that it would apply the proceeds of the forfeited property to any restitution judgment resulting from his conviction. Sheth now

disputes that the United States gave him the appropriate credit for some of the forfeited assets. We agree with Sheth that he did not receive the proper credit for certain bank account funds, but affirm the district court's decision as to the valuation of the real property he contests.

## I.

The specifics of Sheth's crimes are not relevant to this appeal other than that they resulted in a loss to Medicare of about $9 million in payments for services Sheth did not render between 2002 and 2007, and a loss of about $4 million to private healthcare insurers for the same conduct.[1] After the government detected the fraud, in June 2007, it initiated an administrative proceeding in which the United States seized funds from four Harris Bank accounts that the government believed were the proceeds of Sheth's fraud.[2] Harris Bank released those funds to the United States Marshal Service on September 11, 2007. Although the district court opinion did

---

[1] Sheth's conduct was also the subject of a *qui tam* civil action filed under the False Claims Act, 31 U.S.C. §§ 3729–3733, see *United States et. al. v. Sushil A. Sheth, M.D.*, No. 1:06-cv-02191 (N.D. Ill., filed April 19, 2006), and for which there was a $20 million civil judgment. This action is not relevant here but played some role in the first appeal of Sheth's criminal case, particularly in the discussion of restitution, as the $12.37 million criminal judgment was a subset of the losses in the $20 million civil judgment. See *United States v. Sheth*, 759 F.3d 711, 712–13 (7th Cir. 2014).

[2] There was one Harris Bank investment account that the government later relinquished to Sheth's wife, Anita Sheth, and to the Sheths' children which is not relevant to this matter. Anita Sheth successfully petitioned the court, asserting that the funds in that account belonged to her and that she added her husband's name to the account solely for estate-planning purposes. When we refer to the Harris Bank accounts, we refer only to the remaining accounts which are at issue in this case.

not explicitly so state, the parties do not dispute that the Marshals Service held those seized assets in an interest-bearing account.

Meanwhile, in January 2009, the government charged Sheth with healthcare fraud in violation of 18 U.S.C. § 1347. The information sought forfeiture of certain real property, personal property, and funds alleged to be the proceeds of the fraud scheme. Sheth pleaded guilty in August 2009 and agreed to forfeit $13 million in assets. On the other side of the plea agreement, the United States agreed to apply the proceeds of the forfeited property to any restitution agreement. Restitution is a loss-based penalty which seeks to compensate a victim for losses it has incurred, while forfeiture seeks to rectify the ill-gotten gains of the defendant. See *United States v. Swanson*, 394 F.3d 520, 527–28 (7th Cir. 2005).[3]

In this case the government entered into a plea agreement with Sheth which stated:

> Defendant further understands that while forfeiture of property is not typically treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose, it is agreed by the parties that any payments made in satisfaction of the forfeiture judgment shall be credited to any outstanding restitution judgment.

---

[3] For example, one might imagine a scenario in which a defendant stole a painting worth $1 million but sold it on the black market for $5,000. The loss to the owner of the painting is $1 million dollars for which she may be paid restitution (if the painting is never recovered), although the defendant can only forfeit the $5,000.

Plea Agreement, R. 35 at 15. In short, the government agreed to apply the forfeited property to whatever Sheth owed as restitution for his crime. The district court then sentenced Sheth to 60 months' imprisonment and found him liable for $12,376,310 in restitution to Medicare and the private healthcare insurers.

On August 11, 2010, the court entered a preliminary forfeiture order stating that "all right, title, and interest of defendant Sushil Sheth in the following [enumerated] property is hereby forfeit[ed] to the United States of America for disposition according to law." R. 66 at 5. Between the date that the government seized the Harris Bank funds and the time those funds were forfeited in 2010, they had accrued $225,000 in interest. Government Reply Brief in Support of its Motion to Ratify Turnover Order, R. 270 at 5 (the government conceding, "[t]he United States tendered discovery to Sheth showing that the Marshals Service calculated such interest to be about $225,000."). That interest was forfeited and turned over to the government along with the principal. In this appeal, Sheth argues that the government failed to give him credit toward restitution for this approximately $225,000 in interest that had accrued on the $6.5 million in assets seized from the four Harris Bank accounts and turned over to United States coffers.

Sheth also contests the value credited to him for his primary residence in Burr Ridge, Illinois. Sheth owned two parcels of real estate in Burr Ridge. The first, and the subject of this appeal, was the Sheths' residence on Crown Court ("the residence"). The other, not contested here, was an apartment also located in Burr Ridge. After the court issued the preliminary order of forfeiture, Sheth's then wife, Anita Sheth, and their children, filed a petition in 2011, claiming some of the

forfeited property as their own, including these two parcels of real estate. During the 2011 discussions with Anita Sheth about this contested property, the United States erred in assessing the value of the family residence. The United States relied on a 2010 appraisal that the Marshals Service obtained in connection with the forfeiture proceedings which showed that the property was worth $1,086,000 and was encumbered by a $1,559,500 mortgage—in other words, the property was underwater and worthless to the government. The United States therefore relinquished the property to Anita Sheth. It turned out, however, that the government was mistaken about the mortgage indebtedness on the property and the residence, in fact, held significant equity.

The dispute over the value of these assets and others came to a head in September 2012, when the government filed a motion attesting that Sheth was $1,699,941 shy of fulfilling his restitution order and asking the court to issue turnover orders for five retirement accounts worth a total of $300,738 (The government claimed that the forfeited assets satisfied $10,709,309 of the $12,376,301 judgment).[4] See Motion to Ratify Turnover Order, R. 259. Sheth objected, arguing that the assets in the government's possession were sufficient to satisfy the restitution order. The district court ruled for the government, and Sheth appealed. This court held that whether the United States gave Sheth all credits he was due "is a factual dispute that the district court, after allowing for discovery, should have resolved before ruling on the turnover

---

[4] The numbers do not add up exactly, because the unpaid judgment was always accruing interest. At the time of the motion to ratify turnover orders, on October 10, 2014, Sheth owed approximately $33,000 in interest. See Motion to Ratify Turnover Order, R. 259 at 2.

motion," allowing Sheth the opportunity for "discovery and an evidentiary hearing when he asserted a defense to the government's collection effort." *United States v. Sheth*, 759 F.3d 711, 718 (7th Cir. 2014). Notably, we held the government firmly to its promise in the plea agreement that "any payments made in satisfaction of the forfeiture judgment *shall be credited* to any outstanding restitution judgment." *Id.* at 717 (quoting plea agreement) (emphasis in opinion). We remanded the case to the district court for these purposes.

It was during these hearings that Sheth contended that he was entitled to the interest earned on the Harris Bank accounts from the time of seizure to forfeiture. The United States stipulated that if Sheth was entitled to credit, the interest was worth $225,000, but argued that he was not so entitled. The district court agreed.

Sheth also asserted that he was entitled to credit for equity in the Burr Ridge residence. During supplemental filings on remand, Sheth informed the United States that the Sheths had paid down $900,000 of the mortgage and, therefore, there was significant equity in the home released to Anita Sheth. With this new information at hand, the United States agreed to re-evaluate the property and concluded that it had been mistaken about the outstanding amount of the mortgage indebtedness when it relinquished the property to Anita Sheth. If the government had used the corrected mortgage indebtedness amount ($697,914) and a July 2010 estimate of the value of the property ($1,086,000), the resulting equity in the house would have been $388,086 and the estimated net equity, after estimated costs of sale, $215,466.33. The government concluded that the resolution of the error was to give Sheth "credit for half the net equity of the property, relating back to

2011 and assuming a sale for its *fully* appraised value, with reasonable closing costs, and the net proceeds divided with Anita Sheth who had a half-interest in the property." Govt's Supp. Brief in Support of its Motion to Ratify Turnover Order, R. 294 at 4. The United States calculated that amount to be $107,773. Sheth declined the offer.

At a hearing about how much credit Sheth should receive for the residence, Sheth did not contest the appraisal value in July 2010, but argued that the court instead should have used the 2015 sale price when his former wife sold the property. This would have given him a $510,000 credit rather than the $107,733 he received. The government argued that the 2010 appraised value was the more appropriate date as it was closer to when the United States relinquished the property to Anita Sheth, or, if it had not relinquished the property, approximately when it would have sold the property. The court agreed with the government. Sheth appeals both holdings.

## II.

### A.  Interest on the Harris Bank accounts

The arguments have unnecessarily complicated a simple contractual matter. A plea agreement is, of course, nothing more than a contract between two parties—the defendant and the government. *United States v. Brown*, 779 F.3d 486, 492 (7th Cir. 2015). To oversimplify (for just a moment until we address the details), we boil Sheth's argument on this issue down to its elements in the following hypothetical (hypothetical A): Suppose the government suspected that a defendant had committed a crime and seized his bank account containing $100 until such time as a court could make its final determination. In the meantime, the defendant and the

government entered into an agreement that stated as follows: should the court find the defendant guilty and impose any kind of financial penalty, the government will take whatever is in that bank account at the time of forfeiture and apply it to the financial penalty. At the time the court made the determination of guilt, imposed the financial penalty, and forfeited the bank account to the government, the account had earned interest and now contained $110. According to the terms of the agreement, the government would take whatever was in that account—now $110—and apply it to the financial penalty imposed.

Sheth's case is no different. The government has turned the argument into one about whether it is required to pay interest on seized funds. But that question is not presented on these facts. The question is not whether the government must keep forfeited funds in an interest-bearing account (or whether the government is otherwise responsible for interest on forfeited funds it holds). Rather, the question is whether already-accrued interest that has been forfeited to the government must be credited toward a restitution judgment where the government previously has agreed to credit all forfeited funds toward the restitution judgment. We need not decide the broader issue because, in this case, the forfeited funds were, in fact, in an interest-bearing account. Consequently, at the time of forfeiture, there was approximately $225,000 more in the account that had to be applied to the restitution amount. The government, by its own agreement, was required to take whatever was in the account at the time of the forfeiture and apply it to the amount that Sheth owed in financial penalty.

The government's primary argument is that because of the doctrine of sovereign immunity, the United States is not required to pay interest, in the absence of a statute or an express provision of a contract. Again, we need not address this assertion one way or the other, as it is irrelevant to this case. To understand the difference between the issue the government argues and the facts of the current case, we compare the following hypothetical B to the one above: Suppose the government suspected that a defendant had committed a crime and seized $100 in cash until such time as a court could make its determination of guilt or innocence. The agents representing the United States took the $100 and placed it in a safe. In the meantime, the defendant and the government entered into an agreement that stated as follows: should the court find the defendant guilty and impose any kind of financial penalty, the government will take whatever cash it has seized and apply it to the financial penalty. At the time the court made the determination of guilt, imposed the financial penalty, and forfeited the funds, the government had $100 in a safe that it was required to put toward any financial penalty imposed. Pursuant to the agreement, the government was not required to pay interest.[5] All of the government's arguments are geared toward the type of scenario in hypothetical B, but those arguments simply do not address the facts presented in this case.

---

[5] In reality, regulations and guidelines require that the government deposit seized assets into the Seized Asset Deposit Fund where it is held until resolution of the forfeiture proceeding and then deposited in the Asset Forfeiture Fund. See 28 C.F.R. § 8.5 (2012); U.S. Dept. of Justice, United States Attorney's Manual 9-111.600 (2018); U.S. Dept. of Justice, Office of the Inspector General, Audit of the Assets Forfeiture Fund and Seized Asset Deposit Fund Annual Financial Statements Fiscal Year 2018.

In this case, the plea agreement and forfeiture order govern the distribution of the interest. The government, by the plain language of the plea agreement, agreed to take all forfeited funds and apply them to any restitution amount. (Recall that the agreements stated, "it is agreed by the parties that any payments made in satisfaction of the forfeiture judgment shall be credited to any outstanding restitution judgment." Plea Agreement, R. 35 at 15. The order of forfeiture, relying on the plea agreement between Sheth and the government, states that "all right, title, and interest of defendant Sushil Sheth in the" funds from the four Harris Bank accounts "is hereby forfeit[ed] to the United States of America." Preliminary Order of Forfeiture, R. 66 at 5. To put this all together and summarize: (1) The parties agreed that "*all* right, title and interest" in the Harris Bank funds at issue would be forfeited to the government. (2) The parties agreed that any forfeited funds would be applied to the restitution amount. Therefore, (3) all of the money in the Harris Bank funds had to be applied to the restitution amount. By the time the court ordered the forfeiture and "all right, title, and interest" in those Harris Bank funds was forfeited to and transferred to the United States, those accounts included $225,000 in accrued interest which had to be applied to the restitution amount.

Any other solution, of course, would not only violate the agreements, but would be nonsensical. The government did not, after all, return the $225,000 in interest to Sheth, or to Harris Bank, or donate it to charity. It took that interest along with the $6.5 million in principal and placed it into its own coffers—coffers that it uses to pay restitution to victims of crime.[6]

---

[6] The United States Marshals Service held the funds until July 2013 when it turned those funds over to the Clerk of the Court for disbursement to

And that was the logical action. The government cites no authority to state that it was entitled to keep the interest as some kind of windfall. It was entitled to keep the interest because the interest was forfeited along with the principal assets. The usual and general rule is that any interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 162 (1980); See also *Cerajeski v. Zoeller*, 735 F.3d 577, 580 (7th Cir. 2013) ("If you own an apple tree, you own the apples; and if you own a deposit account that pays interest, you own the interest, whether or not state law calls interest property."); *United States v. $277,000 U.S. Currency*, 69 F.3d 1491, 1496 (9th Cir. 1995) ("If the government seized, for example, a pregnant cow and was ultimately found not to be entitled to the cow after it had given birth, it could hardly be contended that the government had fulfilled its duty by returning the now-barren cow, but retaining the calf.")

We also need not delve into the realm of what would have happened to the interest if Sheth had been found not guilty at trial and been entitled to have the accounts returned. We can save that discussion for a case involving those facts. See *United States v. Rand Motors*, 305 F.3d 770, 774 (7th Cir. 2002) ("We will not consider whether in the abstract the United States has some duty to pay interest on seized funds that are later returned."). What matters in these cases is the

---

the non-federal victims, and to the Department of Justice Debt Accounting and Operations Group for disbursement to the government victims. The Government's Motion for an Order Directing the U.S. Marshals Service to Release Funds to Partially Satisfy the Restitution Judgment, R. 199; Order, R. 201.

contractual agreement between the parties. *Id.* And in this case, the government agreed to take the forfeited funds and credit them toward the restitution judgment. Those funds included $225,000 in interest.

The error below appears to have resulted from the district court's misunderstanding about the nature of the funds associated with the Harris Bank accounts. In the initial case below, Sheth argued about miscalculations and inequities in the calculation of many different assets. The specific details about the Harris Bank accounts may have gotten lost in the fray in a case where so many assets, accounts, and funds were at issue. Below, Sheth simply had argued that he was "entitled to interest earned on" the Harris Bank accounts "from 2007 until 2010." Response to Govt's Motion to Ratify Turnover Orders, R. 266 at 1. The government maintained its refusal to credit Sheth with interest on these accounts. It seems that it may not have been clear to the district court that the interest on those accounts already existed. The district court, in its opinion, did not seem to be aware that the Harris Bank funds were being held in an interest-bearing account. The district court judge stated that she was "uncertain why the United States Marshal Service would forgo interest on funds within its possession." D. Ct. Op. at 11 (R. 282 at 11). The court held that Sheth was not entitled to credit for such interest because, the district court explained, "there is no provision in the plea agreement for paying Sheth post-seizure interest." *Id.* at 12. The court juxtaposed the Harris Bank accounts with other accounts that had "*in fact earned*" interest—implying that the court thought that these Harris Bank accounts had not. *Id.* (emphasis in original).

The district court's statement that "[t]here is no provision in the plea agreement for paying Sheth post-seizure interest," (R. 282 at 12), demonstrates that it was considering facts not relevant to resolution of the matter before it. The court seems to be describing a hypothetical scenario C: Suppose the government suspected that a defendant had committed a crime and seized $100 in cash until such time as a court could make its determination of guilt or innocence. The agents representing the United States took the $100 and placed it in a safe. In the meantime, the defendant and the government entered into an agreement that stated as follows: should the court find the defendant guilty and impose any kind of financial penalty, the government will take whatever funds it seized and apply it to the financial penalty. *In the meantime, during the pendency of the case, the government will hold the funds in an interest-bearing account*. According to the terms of the agreement, the government would have been required to place the $100 in an interest-bearing account, and, at the time of forfeiture, take whatever was in that account, interest and all—now $110—and apply it to the financial penalty imposed. This is the scenario that existed in *United States v. Kingsley*, 851 F.2d 16 (1st Cir. 1988), to which both parties turn. In *Kingsley*, the district court specifically ordered the government to place the funds in an interest-bearing account and the government failed to do so. *Id.* at 18. The court in *Kingsley* noted that the defendant had relied on the court's order requiring interest when entering his plea agreement, and therefore the court held the government to the terms of its contractual agreement. This case is not about resolving whether the government was required by law or agreement to hold funds in an interest-bearing account. It is undisputed that those funds were indeed held in an interest-bearing account and earned

$225,000. Our analysis begins with a recognition of this fact (one that the district court may have misunderstood) and moves forward from there.

Once the proper facts are acknowledged, and extraneous scenarios are omitted, the resolution is simple. The government agreed to apply all of the forfeited funds in the Harris Bank accounts to the restitution amount. That amount included the already-earned interest. We need not consider what would have occurred had the interest not been in an interest-bearing account, or had the government been required to return the assets, or any other scenario not associated with the facts of this case. Sheth is merely asking the court to take all of the money it received from the forfeited accounts, at the time it was forfeited, and put it toward Sheth's restitution amount as was the agreement of the parties.

The district court's misunderstanding that the funds had not already earned interest (and one that is understandable given the number of accounts and funds of which the court had to keep track) is further highlighted by its differing treatment of funds located in Oppenheimer, Bright Start, and First Bank accounts. Those funds also earned interest between the time they were first frozen by the government and the time they were forfeited by court order, and the district court applied that earned interest to the amount of restitution.[7] The United States gave Sheth credit for the interest noting, "With regard to these funds, Sheth was credited with whatever interest accrued on those funds while at the respective third-

---

[7] Rather than seize the funds in the Oppenheimer, Bright Start, and First Bank accounts, on February 26, 2008, the government obtained a restraining order freezing those accounts pending resolution of the case.

party depository institution." Government's Memorandum Supporting its Motion to Ratify Turnover Orders, R. 260 at 8. Moreover, the district court, when explaining the discrepancy between the handling of the interest for the Harris Account funds and these other funds stated, "the government credited Sheth with the interest *in fact earned* on the Oppenheimer, Bright Start and First Bank accounts between 2007 and 2010 before they were actually turned over to the Marshals." D. Ct. at 12 (R. 282 at 12) (emphasis in original). The district court seemed to think that the interest earned in the Oppenheimer, Bright Start, and First Bank accounts could be applied to the restitution amount because it had been "in fact earned," but that no interest could be applied for the Harris bank accounts because the "United States Marshal service [had] forgo[ne] interest" on those funds. *Id.* at 11. This was simply an oversight, and one that is understandable given the complexity and number of parts in play in this case. The Harris Bank funds had earned interest just as the Oppenheimer, Bright Start, and First Bank accounts had. This interest was forfeited to the government, just as it was for the Oppenheimer, Bright Start, and First Bank accounts, and should have been applied to the restitution amount, just as it was for the other funds.

It is not entirely clear whether the district court's error was one of fact or law. Did the district court not know that the Harris Bank accounts had earned interest? Or did the district court make a legal error about when to value accounts—which would ordinarily be at the date of the actual forfeiture when the government takes possession of the funds, rather than the date of the preliminary seizure. Title to forfeited property relates back to the United States from the time of the commission of the crime, but this reversion occurs only after forfeiture is effected, which, in the criminal context, occurs

only after a conviction and determination that the assets were the product of illicit activities. *Kingsley*, 851 F.2d at 19–20; see also *United States v. De Ortiz*, 910 F.2d 376, 379–80 (7th Cir. 1990). In the meantime, seized property is in a kind of limbo—belonging totally to neither the defendant nor the government until the underlying criminal matter is finally concluded. *Kingsley*, 851 F.2d at 20.

In this case, we need not decide if the error was factual or legal. Under either standard of review, the district court's determination on this issue cannot stand. See *United States v. Adame-Hernandez*, 763 F.3d 818, 827 (7th Cir. 2014) (The Court of Appeals reviews the district court's interpretation of a plea agreement de novo.); *Soc'y of Lloyd's v. Estate of McMurray*, 274 F.3d 1133, 1135 (7th Cir. 2001) (The Court of Appeals reviews the final disposition of a turnover order on questions of law de novo.); *United States v. Collins*, 503 F.3d 616, 618 (7th Cir. 2007) (factual determinations about plea agreements, "like factual determinations in general, should be reviewed for clear error."). The district court should have credited Sheth for the interest earned on the Harris Bank funds

## B. The Real Property

The resolution over the value of the real property on Crown Court in Burr Ridge is also not inherently a complex matter but muddied by a few errors and misunderstandings. The first occurred when the United States erred in assessing the value of the family residence. The United States failed to include a $900,000 payment toward the mortgage when it calculated the value of the residence. In other words, the government initially presented to the court the value of the residence as follows:

| 2010 appraised value | $1,086,000 |
|---|---|
| mortgage debt | ($1,559,50) |
| **Net equity** | **($473,000)** |

In reality, the value of the residence was as follows:

| 2010 appraised value | $1,086,000 |
|---|---|
| mortgage debt | ($697,915) |
| costs and expenses | ($172,619) |
| **Net equity** | **$215,466** |

During proceedings surrounding the turnover order, the United States conceded its error and suggested that the appropriate resolution was to give Sheth "credit for half the net equity of the property, relating back to 2011 and assuming a sale for its *fully* appraised value, with reasonable closing costs, and the net proceeds divided with Anita Sheth who had a half-interest in the property." R. 294 at 8–9 (emphasis in original). The United States calculated that amount to be half of $215,466 or $107,773. Sheth declined the offer. The court agreed with the government, stating that "Whatever the value of it then [when it was conveyed to Mrs. Sheth] … net of the mortgage obligation is the amount that should be properly—half of that should be properly credited to Dr. Sheth. … I think the way the government treated this property makes perfect sense under the circumstances." Tr. 8/21/17, R. 303 at 7.

At the turnover order hearing in the district court regarding the amount of credit Sheth should receive for the residence, Sheth did not contest the accuracy of the 2010 appraisal, but rather argued that the court should have used the price the property fetched on the market in 2015 when his former wife sold the property for approximately $1.7 million. This would have allowed him to claim a $510,000 credit rather

than the $107,733. The government argued that the 2010 appraised value was the more appropriate date as it was closer to when the United States relinquished the property to Anita Sheth (only one year before the transfer, as opposed to four years after), or, if it had not relinquished the property, approximately when it would have sold the property. The government argued that it would be inappropriate to look at the value of the house four years later, after the real estate market had recovered, and long after the United States would have liquidated it.

On appeal, Sheth makes a different argument. Rather than arguing that the court should have used the 2015 sale price, he argues that the court should have used a 2011 valuation of the property rather than a 2010 valuation. The property was appraised in July 2010, and it was relinquished to Anita Sheth in June 2011. Sheth is technically correct that the government proposed giving Sheth "credit for half the net equity of the property, *relating back to 2011*." Govt's Supp. Brief in Support of its Motion to Ratify Turnover Orders, R. 294 at 8–9, 10 (emphasis ours). And the court agreed with the government's proposal that Sheth would get credit for half of the value of the property when it was conveyed back to Anita Sheth. Tr. 8/21/17, R. 303 at 7.

There are two problems with Sheth's argument on appeal. First, Sheth never raised it in the district court. There he argued only that the court should have used the 2015 sale price. This argument, therefore, has been forfeited.[8] A party forfeits

---

[8] Once again, see *Sansone v. Brennan*, 917 F.3d 975, 983 (7th Cir. 2019), for a discussion of the difference between waiver and forfeiture, the latter of which is at issue here.

an argument by failing to raise it below, or by raising it in a perfunctory or general manner. *Sansone v. Brennan,* 917 F.3d 975, 983 (7th Cir. 2019).

Moreover, Sheth, who had the burden of proof, never offered an appraised value of the residence in 2011. Sheth cites the record to show that the mortgage indebtedness in July 2010 was $697,914 (R. 289-1 at 4); (R. 294 at 4); in December 2010 it was $690, 282 (R. 289-1 at 4); and it was only $667,933 as of August 2012. (R. 294 at 9). See Defendant-Appellant's Opening Brief at 33. Interestingly, even now Sheth does not provide an accurate valuation for July 2011, when the property was relinquished to Anita Sheth.

Even had Sheth not forfeited this argument nor dropped the ball on pointing to evidence in the record of a 2011 valuation, we would still not find error in the district court's application of the 2010 appraisal of the residence. The evaluation of real property can be complicated. It is particularly complicated in this case, because the government did not actually have a chance to sell the property—the ultimate evidence of what the property is worth. Instead, falsely believing that it was underwater, it relinquished the property to Sheth's former wife. This makes it difficult to ascertain at what date and amount the court should have valued the property. The value of the residence in 2010, when the government had it appraised, was a reasonable estimate of its value one year later, in 2011.

We remand to the district court so that it may consider the value of the forfeited interest on the relevant Harris Bank accounts as credit toward Sheth's outstanding restitution judgment. We affirm the district court's holding as to the residence on Crown Point in Burr Ridge.

AFFIRMED IN PART, REVERSED IN PART.